**CARL FISCHER, Inc., et al. v. SHANNON, State Treasurer of Montana, et al.**

No. 1537.

District Court, D. Montana.

Dec. 28, 1938.

Wm. B. Jones and Gunn, Rasch, Hall & Gunn, all of Helena, Mont., for plaintiffs.

Harrison J. Freebourn, Atty. Gen. of Montana, N. A. Rotering, First Asst. Atty. Gen. of Montana, Enor K. Matson, Asst. Atty. Gen. of Montana, and John K. Claxton, of Butte, Mont., for defendants.

Before HANEY, Circuit Judge, and PRAY and BALDWIN, District Judges.

HANEY, Circuit Judge.

This is a suit to enjoin the enforcement of an act of the Montana legislature, on the ground that it violates the Montana and federal Constitutions, the declared purposes of the act being to aid the federal copyright laws and to prevent monopolies and combinations in restraint of trade.

Section 2 of the act in question[1] provides that it is unlawful for two or more persons, holding separate copyrighted works, to pool their separate interests, except "if they issue licenses on rates assessed on a per piece system of usage" which "must be based on and in proportion to the use made of" the copyrighted works, such persons to file once a year with the Secretary of State of Montana, "a complete list of their copyrighted works" with a list of the prices charged for them, and "with additions or revisions made monthly" and "in addition to stating the name and title of the copyrighted work it shall recite therein the date each separate work was copyrighted, and the name of the author, the date of its assignment, if any, or the date of the assignment of any interest therein, if any, and the name of the publisher, the name of the present owner, together with the addresses and residences of all parties who have at any time had any interest in such copyrighted work". Section 3.

Section 4 provides that such list shall be available to all persons for examination. Section 5 requires such a list, except from an individual owner who is not connected with a pool, if such "copyrighted works are used commercially in this State, or have been used herein, whether originating from a point within the State or from without, and as long as any rendition thereof is received or heard within the State, or is intended to be so received by the originator of any musical program". Section 6 provides that "the production and creation of music and the commercial use of music and of copyrighted works within this State, whether originating at a point from within or without the State, as long as the same shall be rendered and publicly received within the confines of this State, whether mechanically or by radio communication, is a business clothed and affected with the public interest" and subject to the police power of the state; that "a copyrighted work used or sold for public use or public performance for profit, if intended to be heard from a point without the State or from a point within the State, is hereby declared to be a commercial commodity, and its legal situs is hereby declared to be within the State of Montana".

Section 7 provides that persons, violating the chapter, shall be deemed to have been doing business within Montana and amenable to the process of its courts, if

---

[1] Laws of Montana 1937, Ch. 90.

they "shall have issued licenses either from within or from without the State", attempted within the state to detect infringements; that use of any of the general privileges of the "state, * * * including the use of the roads and highways," individually or by an agent, "shall be deemed equivalent to and construed to be an appointment" of the Secretary of State as an agent to accept service of process "growing out of a violation of this Act".

Section 8 provides that any person who refuses to abide by the provisions of the act may be enjoined, and thereafter upon refusal, the Court shall appoint the County Auditor as Receiver for the copyrighted works, who shall seize the same, including any rights, then existing, to damages for infringement; that such Receiver shall collect moneys due for use of the works, or as damages, which shall be used to compel obedience to the act; that if any person attempts to withdraw such copyrighted works from the state, the Receiver shall have the Anti-Monopoly Board, created by the act, fix the fees to be charged on a "per-piece" basis, and issue licenses for such fees, so fixed; that the moneys collected shall be used to enforce the act, and at the end of a year if the person persists in his refusal to comply with the act, then he may be permanently deprived of any moneys by order of court, and that at the same time the copyrighted works shall escheat to the state.

Section 9 provides that any appearance by any person proceeded against under the act, whether the appearance is general or special, or whether the process is insufficient or not, shall be deemed to be a general appearance and such person shall be subject to the general jurisdiction of the court.

Section 10 provides other penalties for violation of the act. Section 11 is the separability clause; and Section 12 provides for consolidation of causes instituted in separate counties against the same persons.

The amended bill, hereafter called the bill, alleged that prior to February 13, 1934, the owners of copyrighted musical compositions received no compensation "for the public performance for profit of" their musical compositions, because of difficulty in enforcing individual rights, and inability to secure licenses from widely scattered sources; that on the date mentioned, a small group of composers, authors and publishers organized a voluntary unincorporated non-profit association, under the laws of New York, designated as the American Society of Composers, Authors and Publishers, hereinafter called the Society; that the owners of copyrights assigned to the Society the exclusive rights to license users to publicly perform for profit the works of such owners; that one of the Society's functions is to detect infringements, and institute suits concerning such infringements; and that the Society issued licenses to various establishments according to seating capacity, income, broadcasting power, size, amount of business, number and size of orchestras, methods of performance, or standing.

It was alleged that about 123 publishers and about 1100 writers and composers are members of the Society; that "it is almost impossible at any given time to ascertain exactly how many copyrights are owned by any of the respective publishers, for the reason that old copyrights expire currently and are renewed, sometimes by the publisher and sometimes by the writer and composer, or such others as may be entitled to renewal * * * and new compositions are constantly being registered"; that the Society has power to license users to publicly perform for profit, some 44,-000 musical compositions, and that "powerful" groups have opposed the Society, and made many attempts to use musical compositions without payment; and that the act above related is unconstitutional on a number of grounds, including one that it deals with a subject under the exclusive control of Congress as provided in the Constitution.

The bill was filed by three publishers, seven authors and composers (or their successors), all being the owners of copyrights, and by the president of the Society on behalf of all its members. The bill further alleged that the value of the copyrights owned by each publisher is in excess of $1,000,000; that the right to collect royalties and secure renewals of copyright by each of four authors and composers (complainants) is worth in excess of $100,000; that each of the publishers, and the authors and composers had made assignments to the Society of the right to issue licenses to publicly perform their compositions for profit; that the Society had

issued about 208 licenses in Montana which were in force, and from which the Society received $17,709.55 in 1937; that "the cost of even attempting to" file the required list would be far in excess of $50,000; that each of the publishers, for the year 1936 had received from the Society in excess of $50,000, that each of the authors and composers (complainants) had received from the Society for 1936 in excess of $5,000, and that the publishers and the authors and composers will be entitled to receive a similar sum for each year to January 1, 1940, if their rights are not interfered with and destroyed by the statute. There was also a general allegation that the amount in controversy exceeded $3,000, exclusive of interest and costs. Other allegations regarding the impracticability and impossibility of complying with the statute, and the harm resulting from compliance, need not here be related.

The suit was brought against the State Treasurer, State Auditor, Secretary of State of Montana, two prosecuting attorneys of that state and two unknown defendants. The named defendants filed elaborate motions to dismiss. One ground was that the amount in controversy does not exceed $3,000 exclusive of interest and costs.

The proof of complainants is confined to the value of the copyrights owned, and the cost of preparing the list required by the statute. There is no proof of the value of the right to carry on the business free of the Montana regulations, nor is there proof of the amount of the loss which will occur if the statute is complied with. There is no showing that the cost of compliance will not be returned in greater income. We think, as was held in a similar case, Buck et al. v. Case et al., D.C., W.D.Wash., 24 F.Supp. 541, that there is no showing that the requisite jurisdictional amount is involved. Healy v. Ratta, 292 U.S. 263, 267, 54 S.Ct. 700, 78 L.Ed. 1248; McNutt v. General Motors, etc., Corp., 298 U.S. 178, 181, 56 S.Ct. 780, 80 L.Ed. 1135; KVOS, Inc., v. Associated Press, 299 U.S. 269, 277, 57 S.Ct. 197, 81 L.Ed. 183.

Defendants may present an order of dismissal, based on the above-mentioned ground.

PRAY, District Judge, concurs.

BALDWIN, District Judge (dissenting).

I dissent. On the present state of the record the only question presented for consideration is—does the matter in controversy exceed, exclusive of interest and costs, the sum or value of $3,000? The majority of the Court hold that it does not. I am not able to agree with that holding. In my opinion when the facts appearing on the face of the record in the instant case are measured by the rules of law properly controlling the decision here, the conclusion reached by the majority is not justified.

*The Pleadings:*

Carl Fischer, Inc., G. Schirmer, Inc., Irving Berlin, Inc., Gene Buck, individually and as President of the American Society of Composers, Authors and Publishers, Deems Taylor, Oley Speaks, William J. Hill, Anne Paul Nevin, Ella Herbert Bartlett, Jane Sousa, as Complainants, suing on behalf of themselves and others similarly situated, filed their Bill of Complaint here against the above-named defendants in which they pray that the defendants herein "be enjoined and restrained by preliminary and permanent injunction of this Court, from bringing, directly or indirectly, and from permitting to be brought, directly or indirectly, any proceeding at law or in equity for the purpose of enforcing * * * Chapter 90 of the Laws of 1937 of the State of Montana, against the complainants and others similarly situated, * * * and from taking any steps to create or act as an anti-monopoly board, and from demanding a list of copyrights of musical works from complainants and others similarly situated, and from attempting to appoint or take any steps leading to the appointment of a receiver, and from attempting to seize, escheat or confiscate copyrights and choses in action of complainants and others similarly situated, and from attempting to fix any fees or grant licenses on a per piece system or otherwise, on any of complainants' copyrighted musical works, and from attempting to collect any license fees on the copyrighted musical works of complainants and others similarly situated, and from interfering with all existing contracts entered into between Society on behalf of complainants and others, and citizens and residents of the State of Montana, and from threatening to enforce

against any citizens or residents of the State of Montana, the penalties of said Statute in the event such citizens and residents desire to carry out their contracts with Society or complainants and others similarly situated, and from taking steps to declare an involuntary assignment of the copyrights of complainants and others similarly situated, and from filing lists thereof with the Register of Copyrights in Washington, D. C., and from prosecuting criminally the complainants, their representatives or agents, or any of them, or others similarly situated, for doing any act or thing to detect infringement and to enforce their respective rights under the Copyright Act in the Federal Courts of the State of Montana or elsewhere, and generally, from doing any act or thing to carry out or enforce any of the provisions of said State Statute; * * *." (Pages 35 and 36, Amended Bill of Complaint.)

Process was duly served upon the defendants, and thereafter each and all of them entered their general appearances and filed herein their motions in which they ask the Court to dismiss the Bill of Complaint on the ground and for the reason, among others: "That there is a nonjoinder of certain indispensable parties plaintiff to-wit: the American Society of Composers, Authors and Publishers, an unincorporated association, as mentioned by plaintiffs in the Bill of Complaint."

To obviate this condition the plaintiffs filed herein their Amended Bill of Complaint wherein "Gene Buck, * * * as President of the American Society of Composers, Authors and Publishers," is joined as a party plaintiff.

Among other things it is alleged in said Amended Bill of Complaint:

1. That complainant, Gene Buck, is President of said society; because said membership, as above indicated, is exceedingly numerous and it would be impracticable to join all the members of said society as parties plaintiff, and as the issues and questions involved here are of common and general interest to all of the members of said society, the said society has duly authorized and empowered the said Gene Buck as President thereof to institute and prosecute this suit in its behalf and this action is accordingly brought by said plaintiff, Gene Buck, as President of the American Society of Composers, Authors and Publishers, for and on behalf of said society as well as in his own individual right. (Par. 2a, Amended Bill of Complaint.)

2. This suit is brought to repress and prevent the deprivation under color of Chapter 90 of the Laws of 1937 of the State of Montana, of certain rights, privileges and immunities secured to complainants by the constitution and laws of the United States and the constitution of the State of Montana, that is, the right to have and enjoy exclusive rights under certain copyrights granted to them pursuant to Article 1, Section 8 of the Constitution of the United States, U.S.C.A., and the Copyright Act of 1909, as amended, 35 Stat. L. 1075–1088, U.S.C., Title 17, 17 U.S.C.A. § 1 et seq.

3. This suit, among other things, involves the question as to whether or not each of the complainants may combine with one or more persons, corporations or associations for the purpose of licensing the public performance for profit of their copyrighted musical compositions without the state of Montana, and without doing any act within the State of Montana;

4. Whether or not complainants in combination with one or more other persons have the right to issue by themselves or through any agent, attorney or association the right to citizens of the State of Montana to publicly perform for profit musical compositions copyrighted and owned by complainants and other members of the society and affiliated societies on any basis other than a per piece basis;

5. Whether the State of Montana has the right through its agencies to compel complainants to file within said state a list of musical compositions written, composed, copyrighted or owned by the complainants;

6. Whether the State of Montana may confiscate the property of the complainants within or without the State of Montana, including copyrights of musical compositions owned by complainants.

7. On February 13, 1914, a small group of composers, authors and publishers organized a voluntary unincorporated, nonprofit association under the laws of the State of New York, which they designated as the American Society of Composers, Authors and Publishers, 'for the purpose of licensing to users of music throughout the country the right to publicly perform for profit the works of its members and

has functioned continuously since said date (Par. 17, Amended Complaint); and it has at all times "licensed establishments throughout the country to publicly perform for profit the musical compositions of its members upon fair and reasonable license fees." (See Par. 12, p. 8, Par. 18, p. 15, Par. 19, p. 15, and Par. 21, p. 16, Amended Bill of Complaint, and Exhibits A, B, C, and D attached thereto.)

8. At the present time there are approximately one hundred and twenty-three (123) publisher members of the society; there are approximately eleven hundred (1100) writer and composer members of the society; from time to time said publisher, writer and composer members have entered into contracts with the society, wherein and whereby said members of the society have assigned to it their respective exclusive right of public performance for profit in their respective musical compositions for periods of five years at a time; the last contracts were signed prior to and became operative January 1, 1936. (Par. 18, Amended Bill of Complaint.)

9. By virtue of various treaties and proclamations of the President of the United States, issued pursuant to Section 8 of the Copyright Act, 17 U.S.C.A. § 8, and which are now in force between the United States and Argentina, Austria, Belgium, Brazil, Bulgaria, Czecho-Slovakia, Denmark, England, Finland, France, Germany, Hungary, Italy, Jugoslavia, Norway, Portugal, Rumania, Spain, Sweden and Switzerland, reciprocal rights are granted citizens of the United States and to citizens of the foreign countries named whereby the citizens of such foreign countries are extended copyright protection within the United States, upon compliance with the Copyright Act with respect to their several musical compositions, and citizens of the United States are extended reciprocal protection with respect to their several musical compositions under the copyright acts of said countries upon complying with the copyright acts thereof. (Par. 24a, Amended Bill of Complaint, pp. 18, 19.)

10. Societies similar in purpose and scope to the American Society of Composers, Authors and Publishers have been in existence and are organized and operating under and by virtue of the laws of Argentina, Austria, Belgium, Brazil, Bulgaria, Czecho-Slovakia, Denmark, England, Finland, France, Germany, Hungary, Italy, Jugoslavia, Norway, Portugal, Rumania, Spain, Sweden and Switzerland. (Par. 24a, p. 18, Amended Bill of Complaint.)

11. Under mutual working arrangements with foreign societies the American Society of Composers, Authors and Publishers has the exclusive right to and does license within the United States, the Public performance for profit of the musical compositions copyrighted by all of the members of said respective foreign societies, and said foreign societies have the exclusive right to, and do license within the territorial limits of their respective countries the public performance for profit of musical compositions copyrighted by members of the American Society of Composers, Authors and Publishers and under such arrangements between the American Society of Composers, Authors and Publishers and said foreign societies, the latter are not required to, and never have filed lists of the respective works copyrighted by their respective members. (Par. 24a, p. 19, Amended Bill of Complaint.)

12. The catalogs of said musical compositions of said foreign societies exceed many hundreds of thousands of compositions composed and written by more than 44,000 members of such foreign societies, "the exact number of compositions being utterly impossible to state at any one time on account of the expiration, renewal and obtaining of new copyrights". (Par. 24a, p. 19, Amended Bill of Complaint.)

13. The right to perform the musical compositions embraced in said foreign catalogs are included in the blanket licenses issued to individual licensees by the society in the United States and "it is virtually impossible for the American Society of Composers, Authors and Publishers to obtain the information with respect to foreign copyrights required by Chapter 90 of the Laws of Montana, 1937, and the cost of even attempting to comply with the law would be far in excess of $50,000, and filing of monthly lists of changes would be wholly impracticable, because of expense, distance and necessity of translations, together with the fact that no arrangements exist with foreign societies providing that such information shall be furnished." (Par. 24a, pp. 19, 20, Amended Bill of Complaint.)

14. That since its organization the American Society of Composers, Authors

and Publishers "has been operating throughout the United States, including the State of Montana, until enactment of Chapter 90, Laws of 1937, of the State of Montana, for the purpose of protecting the performing rights in musical works, copyrighted by said members respectively, against infringement because of the public performance thereof for profit". (Par. 2a, p. 2, Amended Bill of Complaint.)

15. The publishers (the complainants Carl Fischer, Inc., G. Schirmer, Inc., and Irving Berlin, Inc. (Par. 1, Amended Bill of Complaint), in furtherance of their business of publishing musical compositions, acquired from writers and composers the right to publish musical compositions written and composed by such writers and composers, respectively, either by outright purchase of such rights or upon a royalty basis and in the great majority of cases acquired from such writers and composers the right to secure copyrights in the compositions purchased by said publishers; that each of the publishers in the course of its many years of conducting its respective business, has registered many thousands of compositions with the Register of Copyrights in Washington, D. C., and each has secured for its respective corporation the ownership of the copyright in many thousands of musical compositions; that in the music business or trade the totality of copyrights of a particular publisher is known as its "material"; that the great majority of each publisher's respective material is likewise copyrighted in foreign countries as well, and copyright protection is obtained by said publishers for their materials in almost every civilized country of the world. (Par. 6, pp. 6, 7, Amended Bill of Complaint.)

16. "That each publisher's business is extensive, and that the value of the copyrights owned by each publisher is in excess of $1,000,000.00." (Par. 6, p. 7, Amended Bill of Complaint.)

17. Complainant, Gene Buck, wrote the lyrics of many musical compositions and for over fifteen years wrote the words and lyrics for the Florenz Ziegfield Follies, as well as the words and lyrics of other musical shows produced with great success; and his right to collect royalties from his works, as well as his right to secure renewals of copyright therein, are worth in excess of $100,000.00. (Par. 11, pp. 9, 10, Amended Bill of Complaint.)

18. Complainant, Deems Taylor, composed the music for two musical compositions entitled "Banks O'Doon" and "Captain Stratton's Fancy" in 1923, and the music for a great many other works and his right to collect royalties from his works, as well as his right to secure renewals of copyright therein are worth in excess of $100,000. (Par. 12, p. 10, Amended Bill of Complaint.)

19. Complainant, Oley Speaks, composed the music for many musical compositions and his right to collect royalties from his works, as well as his right to secure renewals of copyright therein are worth in excess of $100,000. (Par. 13, pp. 10, 11, Amended Bill of Complaint.)

20. Complainant, William J. Hill, has composed the music for a great many works and his right to collect royalties from his works, as well as his right to secure renewals of copyright therein are worth in excess of $100,000. (Par. 14, p. 11, Amended Bill of Complaint.)

21. Complainant, Anne Paul Nevin, is the widow of Ethelbert Nevin, who wrote and composed, among others, the following musical compositions which were duly published and copyrighted: "The Rosary", "Mighty Lak A Rose", "Venetian Suite" and "Narcissus"; she has obtained renewals of some of said compositions in her own name and is advised and verily believes that she will be entitled, under the Copyright Act, to obtain renewals of all of said compositions as and when the original terms thereof expire, during her lifetime. (Par. 15, pp. 11, 12, Amended Bill of Complaint.)

22. "Ella Herbert Bartlett is the daughter of Victor Herbert, the foremost composer in America, who wrote and composed, among others, the following works, all of which were duly registered for copyright: 'Kiss Me Again', 'Natoma', 'Sweet Mystery of Life', 'I'm Falling in Love with Someone', 'Mlle Modiste', 'Red Mill', 'Naughty Marietta', 'Irish Fantasy' and 'Pan Americana'; she has renewed some of the works on which the original term of copyright has expired." (Par. 15, p. 12, Amended Bill of Complaint.)

23. Jane Sousa is the widow of John Phillip Sousa, who wrote and composed a great many compositions, and who was known as the "March King"; among his compositions are the following: "Stars and Stripes Forever", "Adeste Fidelis", "Washington Post March" and "El Capi-

tan", which were duly registered for copyright and she has renewed copyrights on some of said compositions. (Par. 16, p. 12, Amended Bill of Complaint.)

24. Prior to 1917 none of complainants received any compensation for the public performance for profit of musical compositions respectively owned, published, copyrighted, written or composed by them; though users of music throughout the country publicly performed for profit such musical compositions without payment of royalties. (Par. 16, pp. 12, 13, Amended Bill of Complaint.)

25. The American Society of Composers, Authors and Publishers does not deal and has not dealt in any commodity or any sheet music, has exercised and exercises no function with respect to mechanical rights of reproduction and is limited solely to the right of public performance for profit of copyrighted musical compositions owned by its members. (Par. 17, p. 14, Amended Bill of Complaint.)

26. "The society pursuant to the rights vested in it by the contracts made with the other complainants herein, and other members similarly situated, has for many years entered into numerous contracts which are now in force between it and the users of music within the State of Montana, in which the society has licensed such users to publicly perform for profit the musical compositions of its members; there are about 208 contracts in force at the present time from which the society received in 1937, the sum of $17,709.55;" from radio broadcasting stations, motion picture theaters, hotels and restaurants in the state of Montana. (Par. 24, pp. 17, 18, Amended Bill of Complaint.)

27. "Complainants and others similarly situated are not willing to permit their musical compositions to be performed within the State of Montana publicly for profit upon a per piece basis or any basis wherein the fee or compensation would be arbitrarily determined by the State of Montana, or any of its agencies, or by anybody else." (Par. 25, p. 20, Amended Bill of Complaint.) "Complainants believe that such price fixing would deprive them of the exclusive rights vouchsafed to them under the copyright law; if each complainant would be required to act independently in order to have the right to fix license fees, each complainant would be required to have an investigator covering each of the places of public entertainment and amusement in the State of Montana to determine whether payments were being made in accordance with performances; the establishment of such an agency would cost each of the complainants many thousands of dollars and would, in fact, greatly exceed the revenue which each of them might hope to collect in the State of Montana." (Par. 25, pp. 20, 21, Amended Bill of Complaint.)

28. Each of the following claimants has received from the American Society of Composers, Authors and Publishers "for the year 1936 as compensation for the public performance for profit of complainants' works, respectively, in excess of the following sums: Carl Fischer, Inc., in excess of $50,000; G. Schirmer, Inc., in excess of $50,000; Irving Berlin, Inc., in excess of $50,000; Gene Buck, in excess of $5,000; Deems Taylor, in excess of $5,000; Oley Speaks, in excess of $5,000; William J. Hill, in excess of $5,000; Anne Paul Nevin, in excess of $5,000; Ella Herbert Bartlett, in excess of $5,000; and Jane Sousa, in excess of $5,000; upon information and belief said complainants will be entitled to receive for the balance of the period for which they have entered into contracts with the society, and for which the society has contracts with users of music, similar amounts for each year, down to December 31, 1939, and such complainants will receive such amounts for said period if their right thereto is not interfered with and destroyed by such State Statute." (Par. 34, pp. 26, 27, Amended Bill of Complaint.)

Approximately two-thirds of the revenue obtained by the American Society of Composers, Authors and Publishers and distributed to the complainants and others similarly situated is derived from moneys paid for the right to perform publicly for profit by means of radio broadcasting, and if this Court does not interfere and restrain the enforcement of Chapter 90 of the Laws of the State of Montana, 1937, such revenue will be lost to the society, and the complainants and others similarly situated will not participate in royalties from the public performance for profit by means of radio broadcasting "because such performance, even though given in other parts of the United States, may, under the provisions of such State Statute be deemed in violation of such State Statute in the State of Montana and licenses made outside of the State of Montana may result

**734**

in forfeiture by the State of Montana of all complainants' copyrights, and the complainants, who are members of the society, will lose the benefit of their said contracts with the society and all the contracts made by the society and users of music, and will receive no further money from public performance for profit by means of radio broadcasting of their musical compositions." (Par. 34, p. 27, Amended Bill of Complaint.)

The truth of each and all of these allegations was clearly demonstrated by competent evidence introduced by plaintiff at the hearing of defendant's motion to dismiss and plaintiff's application for an interlocutory injunction.

It cannot be doubted:

1. That the controversy here is that defined by the pleadings, Healy v. Ratta, 292 U.S. 263, 267, 54 S.Ct. 700, 78 L.Ed. 1248; Smith v. Adams, 130 U.S. 167, 175, 9 S.Ct. 566, 32 L.Ed. 895;

2. That judicial knowledge is taken of all matters generally known, State ex rel. Kern v. Arnold, 100 Mont. 346, 363, 364, 49 P.2d 976, 100 A.L.R. 1071; Greeson v. Imperial Irrigation District, 9 Cir., 59 F.2d 529, 530, 531, 532; Nev.-Cal. Electric Securities Co. v. Imperial Irrigation District, 9 Cir., 85 F.2d 886, 904; Arizona v. California, 283 U.S. 423, 452, 51 S.Ct. 522, 75 L.Ed. 1154; or,

3. That in the consideration of the pleading the court will read it as if it contained a statement of all matters of which the Court is required to take judicial knowledge, Nev.-Cal. Electric Securities Co. v. Imperial Irrigation District, 9 Cir., 85 F.2d 886, 904; Greeson v. Imperial Irrigation District, 9 Cir., 59 F.2d 529, 530; State ex rel. Kern v. Arnold, 100 Mont. 346, 363, 364, 49 P.2d 976, 100 A.L.R. 1071.

It is generally known that electric impulses set in motion by high powered broadcasting stations in all parts of the United States, the Dominion of Canada and the Republic of Mexico can be and often are reproduced and heard in Montana by the use of modern radio receiving sets, and it is common practice for people in Montana to tune in on broadcasting stations in any of these countries and receive directly the musical programs originating there.

It thus becomes important to consider and determine what, if any, effect the enforcement of the Montana Statute in-volved in the instant case may have upon the rights of the copyright owners' of musical compositions broadcast from stations outside of the State of Montana and received and heard within the boundaries of that state.

*The Statute Involved:*

So far as it is material here, Chapter 90 of the Laws passed at the 25th regular session of the Legislative Assembly of the State of Montana, approved March 12, 1937, is as follows:

"Section 1. * * *.

"Section 2. It shall be unlawful for two or more persons holding or claiming separate copyrighted works under the copyright laws of the United States, either within or without the State, * * * to pool their separate interests or to * * * join together, for the purpose of collecting fees in this State, or to issue blanket licenses in this State, for the right to commercially use or perform publicly their separate copyrighted works; provided however, such persons may join together if they issue licenses on rates assessed on a per piece system of usage; * * *, based on and in proportion to the use made of such copyrighted works and in no case in excess of any other per piece system in operation in other states where any group or persons affected by this act does business, * * *.

"Section 3. In the event two or more persons holding separate copyrighted musical works, or any rights flowing therefrom, * * * by any form of agreement, pool their interests, or * * * join together in any way, whether for a lawful purpose or otherwise, a complete list of their copyrighted works or compositions shall be filed once each year with additions or revisions made monthly in the office of the secretary of State of the State of Montana, together with a list of the prices charged or demanded for their various copyrighted works; * * * and said persons, corporations, or associations, foreign or domestic, shall state therein under oath, that said list is a complete catalogue of the titles of their claimed compositions, * * * and in addition to stating the name and title of the copyrighted work it shall recite therein the date each separate work was copyrighted, and the name of the author, the date of its assignment, if any, or the date of the assignment of any interest therein, if any, and the name of

the publisher, the name of the present owner, together with the addresses and residences of all parties who have at any time had any interest in such copyrighted work. * * *

* * * * * *

"Section 5. No person, corporation, or association, domestic or foreign, whether doing business in this State as hereinafter defined or not, shall be absolved from the foregoing duty of filing said list of holdings as required in the preceding sections of this act, if their music or copyrighted works are used commercially in this State, or have been used herein, whether originating from a point within the State or from without, and as long as any rendition thereof is received or heard within the State, or is intended to be so received by the originator of any musical program; * * *.

"Section 6. It is hereby declared that the production and creation of music and the commercial use of music and of copyrighted works within this State, whether originating at a point from within or without the State, as long as the same shall be rendered and publicly received within the confines of this State, whether mechanically or by radio communication, is a business clothed and affected with the public interest, * * *; it is further declared that any person or persons, or combines, as aforesaid, who shall violate this act shall be deemed to have used their property within this State in such a way that the same shall have acquired a legal situs, analogous to the situs of other personal tangible property within the State, even though separate from the domicile and residence of the owner; provided further, * * * a copyrighted work used or sold for public use or public performance for profit, if intended to be heard from a point without the State or from a point within the State, is hereby declared to be a commercial commodity, and its legal situs is hereby declared to be within the State of Montana.

"Section 7. All persons, groups, corporations, associations, foreign or domestic, violating this chapter, shall be deemed to have been doing business within this State and amenable to the process of the state courts, when any such persons, combinations, or groups shall have issued licenses either from within or from without the State, for the privilege of using commercially and publicly any copyrighted work or works pooled in a common group or entity, * * *, and the use at any time of any general privilege available to any citizen of this State, by * * * any non-resident person, group, entity, or combination as aforesaid, shall be deemed to be an acceptance of the provisions of this act; * * *; and the acceptance of the general privileges of the State of Montana by any non-resident copyright holder or owner, or combination, * * * or organization of any kind, * * *, and the acceptance by such persons of the rights, * * *, or of any general privilege conferred by the law of this State to any of its citizens, * * *, as evidenced by their presence within the State at any time, shall be deemed equivalent to and construed to be an appointment by such non-resident or non-residents, * * *, of the secretary of state of Montana to be his or their true and lawful attorney upon whom may be served all summons and processes against him or them and growing out of a violation of this act, in which said non-resident may be involved, and said acceptance of the privileges of this State, as aforesaid, shall be a signification of his or their agreement that any summons or process against him or them which is so served shall be of the same legal force and validity as if served on him or them personally within the State of Montana. * * * And valid personal service shall thus be had on non-resident persons or individuals, entities, firms, or corporations violating this act.

"Section 8. In the event any person, or groups of persons, or any combination or pool as aforesaid, whether a non-resident corporation, person, or an association, or domestic, refuse to abide by the provisions hereof, * * * then the prosecuting attorney of any county where complaint is made of any violation, shall institute injunction proceedings against said persons in the district court, * * *; and the court shall enjoin all persons from violating the provisions of this act * * *, and all persons aidors and abettors, and agents, shall be enjoined by the court from aiding or furthering in any way a continuation of any violation of this act, either by the payment of money to said defendants or in any way; and if any defendant or defendants persist in defying the judgment of the court, the court shall, * * * order three days notice be given said defendant or defendants, as

the case may be, by having a copy of such notice served on the secretary of state as heretofore provided if defendants are without the State, or served personally if within the State, and have the same published in some daily paper in the State of general circulation, and at the end of said period, if any defendant or defendants refuse to obey the order of the court, then the Court shall appoint the county auditor as receiver for the copyrighted works and property of defendants, tangible or intangible, and of all other effects and moneys derived therefrom, and the receiver shall take over and preserve the commercial rights to all of said copyrighted works, together with such other property of any defendant, combination, pool, corporation, or entity through which they are acting, that he can locate within the State, and the receiver shall administer the same under the direction of the court, * * *; the said receiver shall seize the copyrighted works of all of the copyright holders and owners in said defendant combination, * * * and all sums due on contracts and licenses, and hold the same subject to the order of the court; and all persons holding licenses or contracts with any defendant combination or entity, shall pay the fees and sums due thereon to the receiver for such time as the court may need to effectuate the provisions of this act and to compel any defendant to abide herewith; provided any sums paid on licenses violating this act shall only be continued in the courts discretion or until such time as the court can award defendants complete and full due process of law before entering a final order thereon, or until such time as a legal and equitable system of licensing can be determined according to the subsequent provisions of this act; provided further, in the event any defendant or defendants attempt to withdraw their said copyright works or property from the State in order to violate and render this act or the courts orders ineffectual, or to deprive the citizens of this State of such commodity, or to hamper the enforcement of any provision of this act, or to injure any citizen or user of music in any way, then the court shall immediately order the receiver to compile a complete list of all of the copyrighted works of said defendants which have been used in this State, and the court shall then convene the state anti-monopoly board, as herein now created, consisting of the state treasurer and the state auditor,

and said board shall meet in the county where the suit is filed, and the district judge hearing the cause shall be an advisory member of said board; and said board, of which the state treasurer shall be chairman, shall have only one function, the discouragement of price-fixing and monopolies, and the court shall then submit to said board the single question of the establishment of license rates for the use of these copyrighted works controlled by the defendants so proceeded against, and for the purpose of aiding in the abolition of monopolies and price-fixing, and preventing the violations of this act, the board shall determine a fair and just rate that the receiver should charge for the single and separate public performance for profit of each copyrighted work or works of said defendants, on a per piece system and basis of licensing, * * *; after determining such rate, the said anti-monopoly board shall immediately advise the receiver of its findings, and of its fair rate, * * *, and the receiver may then, if said finding is approved by the court, issue licenses for the use of said music at such approved rate on a basis of so much money per each time a piece of music is played or used in a public performance for profit; that said property shall be thus administered by the receiver for a period of one year, or until such time as the defendants, or the individual copyright owners of any combination so proceeded against take oath that they will abide by the rulings of the court and provisions of this act; and all fees and funds collected by the receiver shall be turned over to the state treasurer, * * *, and the state treasurer shall keep said money in a separate and special fund, subject to the order of the court only for whatever portion thereof that the court may order used to defray the actual expenses of the board and the receivership; at the end of one year, if the defendants and copyright owners or holders in any combination thus proceeded against, continue to wilfully disobey the courts orders, then the court shall issue an order, * * *, to the effect that unless the defendants obey all of the orders of the court within ten days from the date of said order, that the court will proceed to permanently deprive said defendants and each of them of their property; and the court shall then order said defendants to show cause within ten days why they should not be involuntarily compelled to assign all of their

copyrighted works to the receiver forthwith, and to show cause why all of the funds as collected in the manner aforesaid from licenses, together with all of the copyrighted works including the performing rights thereto of said defendants and members of said combine, should not escheat and be forfeited forever to the State of Montana, and be subject thereafter to administration by the State in the same manner as all other personal property belonging to the State of Montana; if any of said defendants and copyright holders, or owners, do appear before the end of said ten day period, and take oath that they will abide by the future orders of the court and the provisions of this act, then the court shall release their copyrighted works and order the state treasurer to return any and all of their money which has been received or seized; * * * if any of said defendants or copyright owners or holders shall ignore or refuse to obey the show cause order, as aforesaid, or fail to appear at the end of ten days as ordered and abide by the courts judgment, then the court shall make an order and enter judgment to the effect that all of the copyrighted works, including the performance rights thereto, of said defendants and the members of any defendant combination, shall be construed as having been escheated and forfeited to the State of Montana, and the court shall thereupon appoint some officer of the court to execute an involuntary assignment of all of the legal and equitable titles to all of the copyrighted works of each of said defendants and members of any defendant combination to the receiver, in the event the defendants or any of their members fail to execute a voluntary assignment, and the receiver shall immediately file said involuntary assignment at the United States copyright office at Washington, D. C.; and the court shall then order the receiver to close the estate, and turn the titles to said copyrighted works over by proper assignment from the receiver to the state treasurer of the State of Montana, who shall thereafter administer, issue licenses for the use of the same in a manner consistent with this act, and conserve the same as State personal property in his possession, and according to law; and any funds left in the state treasury from said receivership shall escheat and be forfeited to the State and become part of the general fund; * * *.

"Section 9. * * *.
"Section 10. * * *.
"Section 11. * * *.
"Section 12. * * *.
"Section 13. * * *.
"Section 14. This act shall be in full force and effect from and after its passage and approval.
"Approved March 12, 1937."

It is admitted by the parties plaintiff in this action that each and all of them and others similarly situated hold and claim separate copyrighted works under the copyright laws of the United States; that they, together with one hundred and twenty-three (123) publishers of copyrighted musical works and approximately eleven hundred (1100) writers and composers of musical works in this country, and forty-four thousand (44,000) writers, composers and publishers of copyrighted musical works, all of whom are similarly situated, have by agreement pooled their separate interests and joined together for the purpose of collecting fees and issuing blanket licenses in the State of Montana and elsewhere for the right to commercially use or perform publicly for profit their separate copyrighted works, not on a per piece system of usage; and that they have not, and will not and cannot, file in the office of the secretary of state of the State of Montana a complete list of their copyrighted works or compositions.

The result is that when the facts in the case at bar are measured by the rules fixed by the statute involved in this proceeding it is obvious that unless the parties plaintiff herein and others similarly situated file in the office of the secretary of state of the State of Montana a complete list of their copyrighted works and compositions once each year, with additions or revisions made monthly, stating the name and title of the copyrighted work and reciting therein the date each separate work was copyrighted and the name of the author, the date of its assignment, if any, or the date of the assignment of any interest therein, if any, and the name of the publisher, the name of the present owner, together with the addresses and residences of all parties who have at any time had any interest in such copyrighted work, which was proven on the hearing of defendant's motion to dismiss and plaintiff's motion for an interlocutory injunction herein to be impossible as a practical mat-

ter; or issue licenses only on rates assessed on a per piece system of usage based on and in proportion of the use made of such copyrighted works, they may be deprived of and permanently lose the moneys due and to become due to them under contracts heretofore entered into by and between them and residents of the State of Montana for the right to commercially use or perform publicly for profit their separate copyrighted works within the state of Montana whether originating from a point within or without that state, as well as the current yearly income now being derived by them from the sale of the right to commercially use and perform publicly for profit their separate copyrighted works and the legal and equitable title to all of the copyrighted works of each of the parties plaintiff herein and all others similarly situated, including the performance rights thereto.

The object of this suit is to enjoin the enforcement of the statute and it is the value of this object thus sought to be gained that determines the value of the matter in controversy here. Packard v. Banton, 264 U.S. 140, 142, 44 S.Ct. 257, 68 L.Ed. 596; Hunt v. Cotton Exchange, 205 U.S. 322, 335, 336, 27 S.Ct. 529, 51 L. Ed. 821.

It appears upon the face of the record in the instant case:

1. The cost of meeting the requirements of the Montana Statute relating to the filing of a complete list of the copyrighted works and compositions of the parties named as complainants herein, and others similarly situated, would be far in excess of $50,000;

2. That the value of the copyrights owned by each of the publishers named as parties complainant in this action—Carl Fischer, Inc., G. Schirmer, Inc., and Irving Berlin, Inc.—is in excess of $1,000,000;

3. That the right of the complainant Gene Buck to collect royalties from his copyrighted musical works, as well as his right to secure renewals of copyrights therein, is worth in excess of $100,000;

4. That the right of complainant Deems Taylor to collect royalties from his copyrighted musical works, as well as his right to secure renewals of copyrights thereon, is worth in excess of $100,000;

5. That the right of the complainant Oley Speaks to collect royalties from his copyrighted musical works, as well as his right to secure renewals of copyrights thereon, is worth in excess of $100,000;

6. That the right of complainant William J. Hill to collect royalties from his copyrighted musical works, as well as his right to secure renewals of copyrights thereon, is worth in excess of $100,000;

7. That each of the following complainants received from the complainant American Society of Composers, Authors and Publishers for the year 1936 as compensation for the public performance for profit of their respective copyrighted works the following sums: Carl Fischer, Inc., in excess of $50,000; G. Schirmer, Inc., in excess of $50,000; Irving Berlin, Inc., in excess of $50,000; Gene Buck, in excess of $5,000; Deems Taylor, in excess of $5,000; Oley Speaks, in excess of $5,000; William J. Hill, in excess of $5,000; Anne Paul Nevin, in excess of $5,000; Ella Herbert Bartlett, in excess of $5,000; and Jane Sousa, in excess of $5,000, and that it is reasonably to be expected that each of them will be entitled to receive from the same society a like amount for the years 1937, 1938 and 1939;

8. That the complainant American Society of Composers, Authors and Publishers had for many years prior to the filing of the bill of complaint herein entered into numerous contracts which were then in force between it and the users of music within the State of Montana in which the said society licenses such users to publicly perform for profit the musical compositions of its members, including the complainants Carl Fischer, Inc., G. Schirmer, Inc., Irving Berlin, Inc., Gene Buck, Deems Taylor, Oley Speaks, William J. Hill, Anne Paul Nevin, Ella Herbert Bartlett and Jane Sousa, and others similarly situated, and that at the time the bill of complaint was filed herein there were about two hundred and eight (208) of such contracts in force from which said society received in 1937 the sum of $17,709.55 from radio broadcasting stations, motion picture theaters, hotels and restaurants in the state of Montana; and,

9. It is reasonable to suppose on the showing made that said society will continue to receive like sums annually under said contracts for the years 1938, 1939 and 1940.

On this state of the record I am unable to comprehend any legal theory on which it can be said with reason that the matter

in controversy here does not exceed, exclusive of interest and costs, the value of $3,000.

The rule is that where, as here, a challenged statute commands the suppression or restriction of any business without reference to the payment of any tax, the right to do business or the injury to it is the matter in controversy. Healy v. Ratta, 292 U.S. 263, 269, 54 S.Ct. 700, 78 L.Ed. 1248; Scott v. Donald, 165 U.S. 107, 114, 115, 17 S.Ct. 262, 41 L.Ed. 648; Bitterman v. Louisville & Nashville R. Co., 207 U.S. 205, 225, 28 S.Ct. 91, 52 L.Ed. 171, 12 Ann. Cas. 693; Hunt v. Cotton Exchange, 205 U.S. 322, 336, 27 S.Ct. 529, 51 L.Ed. 821; Gallardo v. Questell, 1 Cir., 29 F.2d 897, 899.

It appears to me that in the case at bar the value of the right of the parties complainant herein, and each of them, to carry on their business freed from the restraint of the Montana Statute involved herein, as well as the direct property loss that each of them will suffer in the event that statute is enforced and their property is confiscated by the state of Montana, as it may be if the Act in question here is within the competence of the legislative assembly of that state, exceeds the jurisdictional amount, $3,000, exclusive of interest and costs.

Carefully considered in the light of the facts involved therein, none of the cases cited by the majority of the Court in support of the contrary view sustain their conclusion.

In Healy v. Ratta, 292 U.S. 263, 54 S. Ct. 700, 78 L.Ed. 1248, the complainants sought to enjoin the enforcement of a New Hampshire law which requires payment of an annual license tax or fee for every hawker or peddler. The tax involved amounted to approximately $300. Under that condition of the record the Court stated the rule to be as follows: "The disputed tax is the matter in controversy, and its value, not that of the penalty or loss which payment of the tax would avoid, determines the jurisdiction." Page 269, 54 S.Ct. page 703. However, the Court very carefully limited the decision to the facts in that case and was careful to point out that the rules controlling the decision where the collection of an annual tax is sought to be enjoined differ materially in many ways from those controlling the decision in cases which do not involve the payment of such a tax and in that connec-

tion used these words: "Where a challenged statute commands the suppression or restriction of a business without reference to the payment of any tax, the right to do the business or the injury to it is the matter in controversy." Page 269, 54 S.Ct. page 703.

The decision in McNutt v. General Motors, etc. Corp., 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135, turned upon the point, as stated by the Court, that "the bill is thus destitute of any appropriate allegation as to jurisdictional amount save the general allegation that the matter in controversy exceeds $3,000. That allegation is put in issue and the record discloses neither finding or evidence to sustain it." Page 181, 56 S.Ct. page 781.

In the instant case specific facts showing the existence of the jurisdictional amount are set out in the bill of complaint and the amended bill of complaint, and in my opinion these facts were amply proven to be true by competent evidence introduced on the part of the parties complainant at the time the defendant's motion to dismiss and complainants' application for an interlocutory injunction were heard.

In KVOS, Inc., v. Associated Press, 299 U.S. 269, 57 S.Ct. 197, 81 L.Ed. 183, the Court held: The allegations of the bill as to jurisdictional amount may be appropriately challenged by motion to dismiss for want of jurisdiction, when plaintiff moves for an interlocutory injunction, and before time for answer; a motion to dismiss a bill of complaint for want of jurisdiction, made before time for answer, which traverses the allegations of the bill as to the amount in controversy, and in support of the denial alleges facts dehors the bill, does not operate merely as a demurrer admitting the plaintiff's allegations, but requires the trial court to inquire as to its jurisdiction before considering the merits of the prayer for preliminary injunction; where the plaintiff's allegations as to the amount in controversy are challenged by the defendant in this way the plaintiff must support them by competent proof; and "the respondent having failed to support the allegations as to amount in controversy the District Court should have dismissed the bill." Page 279, 57 S.Ct. page 201.

In that case as well as in the case of McNutt v. General Motors, etc., Corp., 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135,

740

the Supreme Court of the United States recognized the rule that the value of the matter in controversy is "the value of the right for which protection is here sought." Page 280, 57 S.Ct. page 201.

I am of the opinion:

First. That defendant's motion to dismiss the amended bill of complaint herein should be denied; and,

Second. That complainants' motion for an interlocutory injunction should be granted.