## HUNT *v.* NEW YORK COTTON EXCHANGE.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF TENNESSEE.

No. 314.   Submitted March 4, 1907.—Decided April 8, 1907.

Quotations of prices on an exchange, collected by the exchange, are property and entitled to the protection of the law, and the exchange has the right to keep them to itself or have them distributed under conditions established by it. *Board of Trade* v. *Christie Grain & Stock Co.,* 198 U. S. 236.

In a suit brought by an exchange to enjoin defendant from receiving quotations from the telegraph company to which it has given the right to distribute them, and from using the same, the value involved is not merely the amount which defendant pays the telegraph company, but the right of the exchange to keep the control of the quotations and protect itself from competition which is the object of the suit; and if the testimony shows, as it does in this case, that such right is worth more than $2,000, the Circuit Court has jurisdiction, so far as amount is concerned; and when the plea presents such an issue the burden is on appellant to show that the amount involved is less than the jurisdictional amount.

The fact that defendant has, in another action in the state court, and to which the exchange was not a party, obtained an injunction against the telegraph company, enjoining it from ceasing to deliver the quotations, does not deprive the Circuit Court of jurisdiction of the suit by the exchange under § 720, Rev. Stat., the parties and the purpose not being the same.

144 Fed. Rep. 511, affirmed.

THIS is a bill in equity brought by the New York Cotton Exchange, a New York corporation, against appellant, a citizen of Tennessee, in the Circuit Court of the United States for the Western District of Tennessee, to enjoin him from receiving and using the quotations of sales made upon the Exchange. The case is here on questions of jurisdiction, and only a synopsis of the principal facts alleged is necessary.

The Exchange is a private corporation under the laws of New York, with 450 members, and owns in the city of New York a building for the use of its members, and conducts therein on every business day cotton sales for present and future delivery, the transfers aggregating many million bales of cotton annually. The purchases and sales for future delivery are permitted to be made and are made only during market hours and by open *viva voce* bidding, and the knowledge of the prices thus made has become a species of property of such value that Telegraph Companies pay large sums of money to the Exchange for the privilege of receiving instantaneously the quotations and distributing the same to customers and many persons in the United States who are engaged in the cotton commission business. Such persons are willing to pay and do pay the Telegraph Companies therefor, and the Exchange realizes from the distribution of the quotations through the Telegraph Companies large sums of money annually. The quotations are such peculiar kind of property that their value depends upon the power of the Exchange to confine the transmission and distribution thereof to such Telegraph Companies and their distributing agencies as will contract therefor with the Exchange, and, that, if any person or corporation is permitted to promptly acquire the quotations surreptitiously or

by theft, or without paying the Exchange therefor, such person or corporation can promptly give the same to numerous other persons, and the Telegraph Companies contracting with the Exchange would thus be put at a disadvantage in competition with such persons so obtaining the quotations without paying for them, and would thereby be deterred from continuing to pay the Exchange the prices provided in the contracts with the Telegraph Companies. The manner of collecting and distributing the quotations is detailed, and yearly the cost to the Exchange, it is alleged, is $4,500. Prior to 1893 the Exchange permitted the Telegraph Companies to gather the quotations through their own employés upon the floor of the Exchange building, and to distribute them without any effective restrictions upon the persons entitled thereto, with the result that many persons used the same in conducting so-called "bucket shops," by reason thereof the bucket shop evil assumed such large proportions and became so serious as to materially affect the legitimate transactions upon the floor of the Exchange, and its members were deprived of many customers. The Exchange therefore found it necessary to terminate such right or license of the Telegraph Companies, and to that end made contracts with them. The contracts are attached to the bill. It is enough to say of them that under them the companies receive the quotations under the condition not to furnish them to any persons, firms or corporations who, or which, may be directly or indirectly engaged in the promotion or maintenance of " bucket shops " or other places where such continuous quotations are used as a basis for bets or other illegal contracts based upon fluctuations of the prices of cotton dealt in on the Exchange. Nor shall the companies directly or indirectly furnish the quotations to any person, firm or corporation, whether members of the Exchange or not, until such person, firm or corporation shall have submitted an application in writing to the Exchange in such form as it shall provide, and until it has approved of the application. The Exchange has power to revoke its approval. In such event the companies shall cease

to furnish the quotations, and if they have installed tickers or wires in the office or place of business of such person, firm or corporation they shall immediately remove the same. This, however, they are not required to do, "or to discontinue service furnished by any other means, which are under restraint by injunctions of the courts during the pendency of the injunction." In case of an application once approved and afterwards disapproved by the Exchange and a suit be commenced against the companies on account of the continuance of the quotations, the Exchange shall defend such suit at its expense and pay all fines, penalties, etc., to which the companies may be subject. In cases where an application has not been approved by the Exchange suits against the companies for the refusal to furnish the quotations shall be defended at the expense of the companies, which shall use diligent efforts to secure the removal of injunctions. If the suit shall be brought against the Exchange it shall defend at its own cost. For the purpose of protecting the companies against the use of quotations originating on the Exchange by parties not entitled to them the companies may prosecute suits in their own name or that of the Exchange to prevent or stop such competitive use.

The Western Union Telegraph Company has to pay the Exchange for the quotations $13,584 per annum in equal installments of $1,132 at the close of each month. The form of the application is attached to the contract.

It is alleged that all persons receiving the quotations have made applications in the form set out; except in a few instances where persons who were receiving quotations from the companies prior to the execution of the contracts have since the execution thereof secured temporary injunctions (the Exchange not being a party to the suits) to enjoin the companies from withholding or withdrawing the quotations on the ground that such persons were not required to sign such applications or secure the approval of the Exchange.

The defendant, Clarence P. Hunt (appellant), has not made application to either of the companies or the Exchange, nor

has the Exchange consented to his receipt of the quotations. On July 14, 1903, he was receiving from the Western Union Telegraph Company the quotations, and the company on said day notified him of the contract between it and the Exchange, and that under said contract the company would be required to and would cease furnishing the quotations. Hunt declined to make an application, but in lieu thereof, on July 31, 1903, filed in the Chancery Court of Shelby County, Tennessee, a petition against the company to enjoin it from ceasing to furnish him said quotations. An *ex parte* injunction was issued. The company then filed its answer, and, the cause coming on for final hearing on appeal and answer, decree was entered for it. The Supreme Court of the State reversed the decree without deciding the merits, for the reason that the Chancery Court should not have decided the cause on bill and answer, but should have awaited the taking of evidence. The cause is now pending and the injunction is still in force, and that by reason thereof only the company is furnishing Hunt the quotations. And it is alleged "that such authorized receipt and use of said quotations by said defendant is calculated to and in time will, if not entirely stopped, seriously impair the value to your orator of its quotations, and that if even one person within the jurisdiction of this court be allowed to secure such quotations without restrictions as to the use thereof which your orator imposes as aforesaid, such person can furnish them to all the bucket shops and other persons within the United States desiring them, and thus entirely defeat the efforts of your orator to prevent their use in bucket shops as a basis of their illegal bets, and materially impair the right of your orator to derive a revenue from the distribution of said quotations."

It is further alleged that there is no adequate remedy at law and that "the amount involved and matters in dispute, exclusive of interest and costs, is much more than the sum of $2,000." An injunction was prayed. A preliminary injunction was issued. 144 Fed. Rep. 511.

The appellant filed a plea to the jurisdiction, traversing the allegations of the bill which averred the jurisdictional amount. A replication. to the plea was filed. The court sustained the jurisdiction. The appellant then filed an answer, in which he alleged that the contracts with the Telegraph Companies were illegal and void, that the Exchange had no right to require the making of applications to it and no right to require the companies to refuse the quotations to persons applying therefor, because such persons refused to make application to the Exchange. He admitted that he had not made an application to the Exchange, but had been desirous and even anxious to pay for the use of the quotations and conform to any reasonable rules or regulations by whomsoever prescribed. He alleged that those stated in the appeal were not reasonable, but unjust, oppressive and illegal. And further, that he commenced business in Memphis as a broker, dealing in cotton, stocks, grain and provisions, about the month of March, 1898, and made application to the Western Union. Telegraph Company, under its designation of the Gold and Stock Telegraph Company, for its quotations by "ticker." The application was accepted, he agreeing to pay therefor the sum of $25 per month. He has continued to receive the quotations until the present time, and has built up and has now a considerable business, at great expense and labor, and the value and profits of the business depend largely upon the receipt and use of the quotations "by and through the 'ticker,' under and in accordance with the contract." The quotations are received through the "ticker" automatically—a specimen of which is attached to the answer—and the letters and figures are at once put upon a blackboard in his office for reference and use, and are used immediately for the transaction of business. They indicate New York as the place from which the quotations are sent, the time of sending, the month the cotton has been sold for. He has transacted no business except as a broker, as stated, and is duly licensed under the laws of Tennessee. Every transaction made by him is evidenced by a report made to his cus-

tomers upon a form, a copy of which is attached to the answer. The report evidences the consummation of the contract and has upon it the following:

"All orders for the purchase or sale of any article are received and executed with the distinct understanding that *actual delivery* is contemplated where order is executed, and that the party giving the order so understands and agrees."

Shortly after July 14, 1903, he was informed that the Exchange had required the Telegraph Company to cancel its contract with him and to take the ticker out of his office and to cease to furnish to him the quotations, thereupon he and other persons similarly engaged in business of broker commenced in the Chancery Court of Shelby County the suit mentioned in the bill. The record and proceedings in the suit are referred to as part of the answer. The bill in that suit prayed an injunction against the Telegraph Company from removing the ticker or refusing to furnish the quotations as long as the company furnished them to any other person. A preliminary injunction was granted. The Western Union Telegraph Company, the defendant in the suit, answered, and based its defense substantially upon its contract with the Exchange. Hunt, upon the authority of such contract, and upon information and belief, averred that the answer was so filed by the company at the request and by the direction and for the benefit of the Exchange, "and with the view and for the purpose of asserting and setting up for him, and in his belief, the very same matters and grounds and causes of action as are set up and relied upon in this suit." Upon the hearing the injunction was discharged and the suit dismissed. The decree was reversed by the Supreme Court of the State and the injunction continued in force. The opinion of the Supreme Court is made part of the answer. It appears therefrom that the court considered that a serious question was presented by the defense of, the contracts between the Telegraph Companies and the Exchange. It was said upon the defense two questions arose—one of fact, whether the contract were made;

the other of law, whether, conceding the existence of the contracts, did "they furnish a sufficient answer to the demands of the complainants." The court declined to pass upon either question, regarding the record imperfect. The court continued the injunction.

The suit is still pending in the Chancery Court, and by reason of his contract with the company of May 1, 1899, and the injunction, Hunt has remained in the use and enjoyment of the ticker, "and is receiving, and the Western Union Telegraph Company has been and is furnishing him, the continuous quotations described in the bill and in this answer." And it is averred that that suit embraces the same questions of fact and law as this present suit and is between the same parties plaintiffs and defendants, and the decree to be pronounced will adjudicate and dispose of the same matters of controversy. That suit is relied on as a bar to the present one, and it is insisted that the Circuit Court had no jurisdiction to grant or issue the injunction prayed for, as "it would require and compel the violation and breach of the injunction granted and in force in the Chancery Court of Shelby County, and the undoing of what has been done and is to be done in the course of the said suit." The other allegations of the answer are not material to the question now involved. A replication to the answer was filed. The case was submitted on the pleadings and exhibits, agreement of counsel as to certain paragraphs of the bill, evidence taken before the court, which consisted of the record of the suit in Shelby County, and testimony of witnesses. It was decreed that a permanent injunction issue restraining Hunt in accordance with the prayer of the bill. Extracts from the testimony will appear in the opinion of the court.

*Mr. Thomas B. Turley* and *Mr. William H. Carroll,* for appellant, submitted:

There is no evidence tending to establish that the matter in dispute between the parties to this suit amounts to $2,000,

exclusive of interest and costs, and the learned trial judge committed an error in so holding.

*Board of Trade v. The Christie Grain Co.,* 198 U. S. 236, can be distinguished. The matter in controversy in the *Christie* case was not the subject of argument or pleading.

The bill is a *quia timet* one, pure and simple. It is neither alleged nor proven that the contract between the appellee and the Telegraph Company was impaired, stopped, impeded or interfered with. The allegation is that such unauthorized receipt and use of said quotations by the appellant is calculated to, and in time will, if not entirely stopped, seriously impair the value to your orator, of its quotations. The proof established that the value of the contract between the appellee and the Telegraph Company is the amount in dollars and cents received and paid. So the question is whether the subject matter of this litigation, is that through the fear and apprehension that unless the appellant is restrained, the value of the contract between the appellee and the Telegraph Company will be depreciated. Thus far that value has not been affected. The Exchange receives the price it stipulated for, and the appellant has paid the Telegraph Company for quotations which he receives from it.

The compensation provided for the privilege of receiving and selling said quotations, necessarily embraces the right to sell such quotations to persons who occupy the relation of the appellant to the Telegraph Company, protected by the injunctive process of a court of competent jurisdiction.

This question is not analogous to the cases holding for jurisdictional purposes, that the amount involved is the value of the complainant's right to conduct its business without being subject to the burden of a nuisance, an illegal tax, or a threatened appropriation of property under an unconstitutional act, of the value of $2,000, exclusive of interest and costs. *Scott v. Donnell,* 165 U. S. 107; *Railroad v. Ward,* 2 Black, 485; *Ins. Co. v. Morrison,* 178 U. S. 262, discussed and distinguished.

Manifestly, the object sought to be accomplished by the

bill in this case is stopping the receipt by the appellant of continuous cotton quotations which he is receiving by virtue of the injunctive process in his suit against the Telegraph Company, now pending in the state court, and necessarily the amount in controversy is determinable by the value to the appellee of the accomplishment of that object. *McNeill v. Railway Co.,* 202 U. S. 543, 558; *McDaniel v. Traylor,* 196 U. S. 415, 422.

Upon the facts and circumstances of this case, the Circuit Court of the United States, in equity, had no jurisdiction to grant the injunction herein.

In this case appellant is not a stranger to the trust, and therefore is not to be restrained, because he does not get at the knowledge which he requires by inducing a breach of trust, nor is he using the knowledge obtained by such a breach. He gets at that knowledge by paying for it.

The transactions on the Chicago Board of Trade and the New York Cotton Exchange and the New York Stock Exchange are legal transactions, and enforcible, and so far as the appellant is concerned every transaction which he makes is a legal transaction, within the cases adjudged by this court. *Clews v. Jamison,* 182 U. S. 461, 489.

Whether this case be viewed as a case analogous to a trade secret, or the use of valuable information gathered by others, upon the facts disclosed by the record, the court was without jurisdiction to grant the final decree enjoining the appellant. High on Injunction, 4th ed., § 19, p. 27.

The appellant, under the peril of a contempt proceeding, is deprived of the benefit of the judgment of the state court, and the effect of the decree is to enjoin him from enforcing the decree of the state court.

*Mr. Henry S. Robbins, Mr. Henry W. Taft* and *Mr. Henry Craft,* for appellee:

The amount in dispute exceeds $2,000.

Upon this issue the burden of proof was upon appellant.

*Sheppard* v. *Graves*, 14 How. 504, 510; *Adams* v. *Shirk*, 55 C. C. A. 25; *S. C.*, 117 Fed. Rep. 801; *Penna. Co.* v. *Bay*, 138 Fed. Rep. 203; *Wetmore* v. *Rymer*, 169 U. S. 115; *Gage* v. *Pumpelly*, 108 U. S. 164; *R. R. Co.* v. *Ward*, 2 Black, 485; *Ry. Co.* v. *Kuteman*, 54 Fed. Rep. 547; *Whitman* v. *Hubbell*, 30 Fed. Rep. 81; *McNeill* v. *Southern Ry. Co.*, 202 U. S. 558; *Hutchinson* v. *Beckham*, 118 Fed. Rep. 399; *Butchers' &c. Co.* v. *Louisville & N. R. Co.*, 14 C. C. A. 290; *S. C.*, 67 Fed. Rep. 35; *Scott* v. *Donald*, 165 U. S. 107; *Amelia Milling Co.* v. *Tennessee Coal Co.*, 123 Fed. Rep. 811; *Humes* v. *City*, 93 Fed. Rep. 857; *Nashville Ry. Co.* v. *McConnell*, 82 Fed. Rep. 65; *Smith* v. *Bivens*, 56 Fed. Rep. 352; *Lanning* v. *Osborne*, 79 Fed. Rep. 657.

The question presented by the second assignment of error is only whether the pendency of the prior state court suit is a bar to relief in the suit at bar, and this, as respects jurisdiction, is not different in its nature from the question whether in a suit in chancery the remedy is not at law. In both cases this court has several times decided that the question thus raised was not one of jurisdiction within the act of 1891. *Smith* v. *McKay*, 161 U. S. 355; *Blythe* v. *Hinckley*, 173 U. S. 501, 507.

The objection that the court cannot grant the relief sought because of prior state court litigation pending, or constituting *res adjudicata*, does not present a question of jurisdiction. *Blythe* v. *Hinckley*, 173 U. S. 501, 507; *Huntington* v. *Laidley*, 176 U. S. 668, 679; *Louisville Trust Co.* v. *Knott*, 191 U. S. 225; *Bache* v. *Hunt*, 193 U. S. 523.

The prior pendency of a suit (not involving the court's possession of the *res*) in one jurisdiction is no bar to a like suit, even between the same parties, in another jurisdiction, and that within this rule a state court and a Federal court (even within that State) are courts of different jurisdictions. *Gordon* v. *Gilfoil*, 99 U. S. 168; *Stanton* v. *Embrey*, 93 U. S. 548; *Insurance Co.* v. *Brune's Assignee*, 96 U. S. 588; *Merritt* v. *American Barge Co.*, 24 C. C. A. 530; *S. C.*, 79 Fed. Rep. 228; *Shaw* v. *Lyman*,

79 Fed. Rep. 2; *Defiance Water Co.* v. *City,* 100 Fed. Rep. 178; *Marshall* v. *Otto,* 59 Fed. Rep. 249; *Hurst* v. *Everett,* 21 Fed. Rep. 218.

Mr. Justice McKenna, after stating the case as above, delivered the opinion of the court.

It will be observed that this case is like the *Board of Trade of the City of Chicago* v. *Christie Grain & Stock Company,* 198 U. S. 236, and we therefore start with some propositions established. It is established that the quotations are property and are entitled to the protection of the law, and that the Exchange "has the right to keep the work which it has done, or paid for doing, to itself." It is, however, contended by appellant that the controversy about them that this suit presents does not involve the value of $2,000, exclusive of interest and costs. This is the issue presented by the plea to the jurisdiction. Appellant contends that the value involved is measured by his contract with the Telegraph Company. The Exchange contends that the matter in dispute is the value of the object sought to be accomplished by the bill. The Circuit Court expressed it to be "the value of the contract between the New York Cotton Exchange and the Western Union Telegraph Company."

On the issue presented by the plea the burden of proof was upon the appellant, and he was required to establish by a preponderance of the evidence that the amount involved was less than the jurisdictional amount. *Sheppard* v. *Graves,* 14 How. 504; *Wetmore* v. *Rymer,* 169 U. S. 115; *Gage* v. *Pumpelly,* 108 U. S. 164; *Adams* v. *Shirk,* 117 Fed. Rep. 801. The only evidence offered by him was his contract with the Telegraph Company in connection with evidence of the manner of his receipt and use of the quotations. This testimony was to the effect that the quotations are communicated through a ticker, which is a machine with a tape attached to it, that registers the price of cotton, giving the hour. They come sometimes

not more than a quarter of a minute or a half of a minute apart, and are copied from the tape and placed upon a blackboard, where all can see them. When new quotations are received the old ones are generally wiped out. The "ticker service is very slow, and the value of it depends on the time it is received. After it is put upon the blackboard it becomes public property, so far as concerns the value of it." And it was testified that a firm by the name of Ganong & Fitzgerald received their quotations about five minutes before appellant, they having better wire service. And also that there was a wire running into the Memphis Cotton Exchange, and that not quite a minute elapsed from the time the ticker registers the market quotations to the time they are registered on the blackboard in the city of Memphis and open to the public. Appellant testified that the amount of his business in cotton for future delivery amounted to one-half million dollars per year, and when he took a trade himself he was prepared to deliver the cotton or commodity in conformity with the agreement between himself and his customer, and goes so far as to write across all orders that actual delivery is contemplated and understood.

A witness on the part of the Exchange testified that he was employed by the Board of Trade as expert to investigate persons who pretended to be brokers, "but who were in fact bucket shops," and was in that position for several years, gathered statistics, made estimates of the volume of business during 1901 and 1902, and has kept pretty well informed ever since as to the number of bucket shops in the United States. And he further testified that trades are carried on in such shops in all commodities that are traded in on the New York Cotton Exchange, New York Stock Exchange and the Chicago Board of Trade. Of the value of the right of the New York Cotton Exchange to control the distribution of its quotations he said: "One can only estimate or approximate the value of the right, for the reason that the volume of speculative business in the country changes, and that changes the value of the right. If there is a large volume of speculative business

in cotton the value to the New York Cotton Exchange would probably amount to a million dollars, while with a depressed market it would not amount to more than $200,000 or $300,000." And this is the amount per year.

A superintendent of the Exchange testified to his familiarity in a general way with what is called the independent trader, or independent trade, as distinguished from the trade or traders who carry their transactions to the cotton exchanges of the country, and in a measure with the volume of business done by such persons in an approximate way.

He further testified that the amount of business thus diverted from the Exchange made a difference to the Exchange of fully one million dollars a year, and that the value of the right to control the distribution of the quotations in the manner set out in the bill would very much exceed $2,000.

The witness was unable to state the relative amount of business done on the Exchange in the years 1903, 1904 and 1905, because there was no record of the transactions kept, but he reached the conclusion in regard to the value of the business diverted from the Exchange partly from the evidence given by appellee and partly as to the business done by the bucket shops. And he put the value, "in dollars and cents," of the contract between the Exchange and the Telegraph Company, independent of the amount of business diverted, at the amount the Exchange received from the Telegraph Company. The following colloquy took place between the witness and counsel for appellant:

"Q. Now, Mr. King, what time, up to this good moment and hour, has that exchange failed to receive the amount of that contract, that is, for giving the Western Union Telegraph Company the right to furnish this information gathered on the floor of the New York Cotton Exchange?

"A. It has not.

"Q. Then in short this here is nothing except fear and apprehension that unless these defendants are restrained that is likely to happen, and affect the value of the contract?

"A. And the business upon the Exchange."

It is manifest that the injury to the Exchange is not the rate paid by the appellant to the Telegraph Company. The purpose of the suit is to enjoin the appellant from receiving, using or selling, directly or indirectly, the Exchange's quotations or permitting or maintaining any wire to his office over which the quotations are passing, or distributing the quotations, until he shall have acquired the right to receive them either by contract of purchase from the Exchange, or with its consent and approval, from one of the Telegraph Companies authorized to distribute them.  In other words, the object of the suit is to keep the control of the quotations by the Exchange and its protection from the competition of bucket shops or the identity of its business with that of bucket shops.  And the right to the quotations was declared, as we said in *Board of Trade* v. *Christie Grain & Stock Company,* to be property, and the Exchange may keep them to itself or communicate them to others. The object of this suit is to protect that right.  The right, therefore, is the matter in dispute, and its value to the Exchange determines the jurisdiction, not the rate paid by appellant to the Telegraph Company.  The value of the right was testified to be much greater than $2,000.  In *Mississippi & Missouri Railroad Company* v. *Ward,* 2 Black, 485, it was decided that jurisdiction is tested by the value of the object to be gained by the bill.  To the same effect is *Board of Trade* v. *Cella Commission Company,* 145 Fed. Rep. 28.  In the latter suit the Chicago Board of Trade obtained a decree restraining the use of its continuous quotations by the Cella Commission Company.  It was said that the amount or value of such right is not the sum a complainant might recover in an action at law for the damage already sustained, nor is he required to wait until it reaches the jurisdictional amount. The latter declaration is supported by *Scott* v. *Donnell,* 165 U. S. 107.

Counsel for appellant do not deny that jurisdiction is determinable by the object sought to be accomplished by the bill,

but they assert that the value of that was speculative and changed with the volume of business. Counsel lay great stress on the testimony of the superintendent of the Exchange, to the effect that the value of the contract between the Exchange and the Telegraph Company, independent of the business diverted from the Exchange, is, in dollars and cents, the amount it receives from the Telegraph Company. Upon this testimony counsel assert the right claimed by the Exchange to be the narrow one of preventing the appellant from receiving the continuous quotations from the Telegraph Company, which he pays for, pending a litigation in the state courts, and this distinguishes the case from the *Board of Trade* v. *Christie Grain & Stock Company,* and contend that the jurisdictional amount has not been established, as the Telegraph Company is fulfilling its contract with the Exchange. Of the latter contention we have sufficiently indicated our view, and it is only necessary to add that because the value of the quotations to the Exchange varies with the volume of business does not impair the effect of the testimony that the value of its right to control them is "much greater than $2,000." We cannot concur in the conclusion urged by appellant that this case is distinguishable in principle from *Board of Trade* v. *Christie Grain & Stock Company,* either in the right asserted or in the defense against it. Even if the cases were distinguishable, it might still be contended, that would be of no consequence in determining the jurisdictional amount of the matter in dispute. But we will consider the difference claimed to exist between the cases. In the *Christie case,* it is contended, the right asserted was "to prevent getting at the knowledge of a trade secret or the quotations of the market surreptitiously, and using the knowledge so obtained," and that, it is insisted, was the matter in controversy. "Here," it is said, "there is no violation of a duty or trust. The market quotations are not received surreptitiously. The appellant is not depriving the appellee of the protection of the law." In the *Christie case* the quotations were gotten and published, "in some way not

disclosed," but, it was said, as the defendants did not get them from the Telegraph Companies authorized to distribute them, had declined to sign contracts satisfactory to the plaintiff (Board of Trade) and denied the plaintiff's rights altogether, it was a reasonable conclusion that they got, and intended to get, their knowledge in a way which was wrongful. This, however, was not said to limit the plaintiff's right but to express a violation of it. The right was clearly defined to be, the right of the Board of Trade to keep the quotations to itself or communicate them to others. And this is also the right of the Exchange in the case at bar. It can be violated not only by getting the quotations surreptitiously or "in some way not disclosed," or by getting them from a person forbidden to communicate them.

The next contention of appellant is that the court had no jurisdiction to grant the injunction and pronounce the decree appealed from. The only question involved in this branch of the case, appellant says, is "whether it comes within the provision of the Revised Statutes, § 720, which is to the effect that no writ of injunction shall be granted by a court of the United States to stay proceedings of any court except in matters of bankruptcy."

And, appellant insists, that this suit necessarily offends that section, because under its decree he "cannot have the benefit of the judgment of the state court without being in contempt of the Federal court," and that he is restrained by the Circuit Court from receiving from the Telegraph Company what the company is forbidden to refuse him by the state court. To sustain his contention appellant cites *United States* v. *Parkhurst Davis Mercantile Company,* 176 U. S. 317, and cases there referred to. Also *Diggs* v. *Woolford,* 4 Cranch, 179; *Watson* v. *Jones,* 13 Wall. 579; *Dyall* v. *Reynolds,* 96 U. S. 340; *Central &c. Bank* v. *Stevens,* 169 U. S. 433. These cases do not sustain his contention. In *Central Bank* v. *Stevens* it was decided that a state court had no power to enjoin a party whose rights had been adjudged by a Circuit Court of

the United States from proceeding with a sale of property under a decree of that court. In the other cases cited, except *Watson* v. *Jones*, the purpose was to directly enjoin parties from proceeding in the state courts. In *Watson* v. *Jones* was considered what identity of parties, rights and relief prayed for were necessary to enable the pendency of an action in one court to be pleaded in bar in another court, and it was said: "The identity in these particulars should be such that if the pending case had already been disposed of, it could be pleaded in bar as a former adjudication of the same matter between the same parties." The principle was also expressed in that case, and sustained by authorities, that the possession of property by one court cannot be interfered with by another, and, that "The act of Congress of March 2, 1793 (now § 720 of the Revised Statutes of the United States) as construed in *Diggs* v. *Walcott*, 4 Cranch, 179, and *Peck* v. *Jenness*, 7 How. 625, are equally conclusive against any injunctions from the Circuit Court, forbidding the defendants in the case to take possession of property which an unexecuted decree of a state court required the marshal to deliver to them." The case at bar has not that feature, nor has it identity with the case in the Chancery Court of Shelby County. Its parties and purposes are different. The pendency of a suit in a state court does not deprive a Federal court of jurisdiction. *Gordon* v. *Gilfoil*, 99 U. S. 168; *Insurance Co.* v. *Brunes' Assignee*, 96 U. S. 588; *Stanton et al.* v. *Embrey, Administrator*, 93 U. S. 548; *Merritt* v. *American Barge Co.*, 79 Fed. Rep. 228; *Bank of Kentucky* v. *Stone*, 88 Fed. Rep. 383.

The Circuit Court had jurisdiction, and its decree is

*Affirmed.*