**Morris BASS, Barney Scardino, individually and on behalf of all others similarly situated, Plaintiffs,**

**v.**

**Nelson ROCKEFELLER, Governor of the State of New York, individually and in his official capacity, et al., Defendants.**

**No. 71 Civ. 2088.**

United States District Court,
S. D. New York.

May 27, 1971.

Steven J. Cole, Henry A. Freedman, Toby Golick, of Center on Social Welfare & Policy Law, New York City, Sylvia A. Law, of Health Law Project, Philadelphia, Pa., Paul Tulley, Marttie L. Thompson, David A. Diamond, of Mobilization for Youth, New York City, for plaintiffs.

Louis J. Lefkowitz, Atty. Gen. of N. Y., for defendants; Steven M. Hochberg, Asst. Atty. Gen., Samuel A. Hirshowitz, First Asst. Atty. Gen., of counsel.

## OPINION

TENNEY, District Judge.

On May 12, 1971, after oral argument with both sides present, this Court filed a memorandum-opinion and order temporarily restraining defendants from implementing (a) Chapters 113 and 131 of the Laws of New York, which chapters amend Sections 366 and 365–a, respectively, of the New York Social Services Law, McKinney's Consol.Laws, c. 55, and were to become effective May 15, 1971, and (b) two Administrative Letters (71–PWD–17 and 71–PWD–19) [1]

issued by the Department of Social Services pursuant thereto. Argument on the instant motion for a preliminary injunction was deferred at the State's request until May 20, 1971.

The thrust of Chapter 113 is to reduce the availability of medical assistance to poor persons by lowering the income and resource levels which are determinative of eligibility for medical assistance under New York State's Medicaid Program, N.Y.Soc.Serv.L. §§ 363 et seq. Chapter 131 eliminates a number of benefits and services (e. g., dental care, prescription drugs, eyeglasses, optometrist's services, podiatrist's services, chiropractic services and rehabilitative therapies) [2] previously available to many persons who qualified for medical assistance under the Medicaid Program. More specifically, the Chapter 131 cutbacks, if implemented, would deprive the "medically needy" citizens of the State (i. e., those individuals whose income and resources exceed public assistance levels but are nevertheless unable to purchase the covered medical services) of benefits and services previously available to them.

Plaintiffs,[3] individually and on behalf of all others similarly situated, urge that Chapters 113 and 131, if implemented, will violate Section 1902(d) of the Social Security Act (hereinafter referred to as the "Act"), 42 U.S.C. § 1396a(d), and .cause them and members of their class immediate, serious and irreparable injury. The gravamen of the complaint

---

1. Administrative Letter 71–PWD–17 dealing with elective abortions has recently been stricken as unconstitutional by the State Supreme Court. City of New York v. Wyman, 321 N.Y.S.2d 695 (Sup.Ct. May 18, 1971). Insofar as it was determined therein that elimination of reimbursement for elective abortions is a modification or reduction of medical services, as opposed to a clarification of State policy, I concur herein with the opinion of Justice Spiegel. However, since this issue would now appear moot, the Court will not accept a brief Amicus Curiae.

2. The Court has been advised that on May 24, 1971 Chapter 131 of the Laws of New York was amended to restore payments for home nursing care and transportation required in order to obtain care and service. Affid. of Steven M. Hochberg, Esq., (dated May 25, 1971).

3. Both named plaintiffs are poor persons suffering from Parkinson's disease who stand to lose reimbursement for the costly prescription medicine that they require daily. The immediate and irreparable injury plaintiffs and members of their class stand to suffer is patent from the nature of the class and cutbacks at issue herein, and therefore need not be belabored by extended discussion.

and basis for the within application for injunctive relief is that Section 1902(d) of the Act, 42 U.S.C. § 1396a(d), prohibits reduction of both the number of persons eligible for Medicaid, and the benefits and services provided such persons, without prior approval by the Secretary of Health, Education and Welfare (hereinafter referred to as the "Secretary"), pursuant to a required certification from the Governor of the State.

Section 1396a(d) of Title 42 of the United States Code, the statute at issue herein, provides as follows:

"(d) Modification; certification requirements

Whenever any State desires a modification of the State plan for medical assistance so as to reduce the scope or extent of the care and services provided as medical assistance under such plan, or to terminate any of such care and services, the Secretary shall, upon application of the State, approve any such modification if the Governor of such State certifies to the Secretary that—

(1) the average quarterly amount of non-Federal funds expended in providing medical assistance under the plan for any consecutive four-quarter period after the quarter in which such modification takes effect will not be less than the average quarterly amount of such funds expended in providing such assistance for the four-quarter period which immediately precedes the quarter in which such modification is to become effective,

(2) the State is fully complying with the provisions of its State plan (relating to control of utilization and costs of services) which are included therein pursuant to the requirements of subsection (a) (30) of this section, and

(3) the modification is not made for the purpose of increasing the standard or other formula for determining payments for those types of care or services which, after such modification, are provided under the State plan,

and if the Secretary finds that the State is complying with the provisions of its State plan referred to in clause (2) ; except that nothing in this subsection shall be construed to authorize any modification in the State plan of any State which would terminate the care or services required to be included pursuant to subsection (a) (13) of this section. Any increase in the formula or other standard for determining payments for those types of care or services which, after such modification, are provided under the State plan shall be made only after approval thereof by the Secretary.

In construing this statute, plaintiffs contend that approval by the Secretary is a condition precedent to any modification by the state, which would either increase the standard of eligibility for medical assistance or decrease the services available to existing recipients of these benefits. It is not disputed, nor could it be, that the amendments to the New York Social Services Law at issue herein will have this effect. In opposition to the injunction, the State argues, first, that this Court is without jurisdiction over the instant action, and, second, that even assuming that jurisdiction exists, prior federal approval of the State's modification is not required under the statute.[4]

Inasmuch as the absence of jurisdiction would preclude this Court from further considering movant's arguments on the merits, logic dictates that this threshold issue be first resolved.

Plaintiffs assert jurisdiction of this Court on three different bases. Inas-

4. Although at the time the temporary restraining order issued no certification had been made by the Governor, shortly thereafter, on May 14, 1971, the requisite certification was made. Affid. of Steven M. Hochberg, Esq. (dated May 14, 1971). This, of course, does not moot the issue since the Secretary has not made the necessary finding or approved the modifications.

much as jurisdiction is properly vested in this Court under 28 U.S.C. § 1331, it is unnecessary to determine whether jurisdiction properly exists under 28 U.S.C. §§ 1343 and 1337.[5] Section 1331 provides this Court with original jurisdiction over civil actions arising under the laws of the United States if the matter in controversy exceeds the value of $10,-000. Clearly the within action is one arising under the laws of the United States; however, it is disputed as to whether plaintiffs individually meet the monetary requirement and, if not, whether they can aggregate their claims in order to reach the $10,000 amount.

▇ The Supreme Court in Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969), reaffirmed the principle that "separate and distinct" claims presented by various claimants may not be added together to provide the $10,000 jurisdictional amount in controversy. Prior to the 1966 amendment of Fed.R. Civ.P. 23, only in "true" class actions was aggregation of the class claims permitted since the rights of the class members were deemed common and undivided. The Court, in Snyder v. Harris, *supra,* held that the amendment of Rule 23 had not altered the test for aggregation which was based upon a statutory interpretation of "matter in controversy".

Unfortunately, while Snyder v. Harris, *supra,* reaffirmed settled law on aggregation of class claims, it did not clarify the distinction between "separate and distinct" claims and those claims in which the class had a common and un-

---

5. 28 U.S.C. § 1337: "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies."

Since jurisdiction is found herein under 28 U.S.C. § 1331, and since it is unlikely that jurisdiction under § 1337 can be established, no discussion of that section as a basis of jurisdiction is offered.

However, there is a strong likelihood that jurisdiction could also have been found under 28 U.S.C. § 1343(4):

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

(1) * * *

(2) * * *

(3) * * *

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

Had jurisdiction been founded on § 1343 (4), it would have been unnecessary for plaintiffs to establish that the $10,000 requirement for § 1331 had been met.

The conclusion that jurisdiction might also have been based on § 1343(4) stems from the fact that the Social Security Act seems to provide the plaintiffs with certain enforceable rights or privileges. Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); Johnson v. Harder,

438 F.2d 7, 11 (2d Cir. 1971). The plain language of 42 U.S.C. § 1983 provides that anyone who is deprived of a right or privilege secured to him by the Constitution and *laws* has a cause of action for redress. While § 1983 has generally been limited to actions seeking the redress of a deprivation of Constitutional rights, it has also been utilized by persons seeking the protection of statutory rights. *Cf.,* Greenwood v. Peacock, 384 U.S. 808, 829, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966); Gomez v. Florida State Employment Service, 417 F.2d 569, 578–579 (5th Cir. 1969).

Therefore, since plaintiffs in the present suit claim they are being deprived of statutory rights or privileges, they seem to have a § 1983 cause of action for which § 1343(4) provides the requisite jurisdiction without regard to the amount in controversy. Clearly, § 1983 is an act of Congress providing for the protection of civil rights. Hall v. Garson, 430 F.2d 430, 438 (5th Cir. 1970); Gomez v. Florida State Employment Service, 417 F.2d at 580.

The final hurdle to § 1343(4) jurisdiction might appear to be the personal vs. property right dichotomy recognized in Hague v. C. I. O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) and Eisen v. Eastman, 421 F.2d 560 (2d Cir. 1969). However, Johnson v. Harder, 438 F. 2d at 11–12, specifically indicates that rights similar to those asserted by the plaintiffs are of the personal nature and do provide the district courts with § 1343 jurisdiction.

divided interest. The case law interpreting these concepts has often been confusing and occasionally inconsistent. *See generally*, Aggregation of Claims in Class Actions, 68 Col.L.Rev. 1554 (1968).

■ It has been noted that there exist essentially two tests for determining when aggregation will be permitted. Aggregation of Claims in Class Actions, 68 Col.L.Rev. at 1558–62. The interest in distribution test indicates that a common and undivided claim exists when the adversary of the class has no interest in how the claim is to be distributed among the class members. *E. g.*, Shields v. Thomas, 58 U.S. (17 How.) 3, 15 L.Ed. 93 (1854). The second test, the essential party test, allows aggregation of class claims when none of the class members could bring suit without directly affecting the rights of his co-parties. *E. g.*, Pentland v. Dravo Corp., 152 F.2d 851, 852 (3rd Cir. 1945). Under either of these approaches it seems clear that the present suit is proper for aggregation. The defendants, various New York State officials, although concerned with whether the State can cut back Medicaid expenditures prior to approval by the Secretary, have no interest in the apportionment of these monies among the medically needy. Furthermore, no single member of the class could bring an action and litigate only his claim for maintained medical assistance from the State without obviously determining the rights of the remaining members of the class.

The Court in Snyder v. Harris, *supra*, did provide two justifications for the traditional aggregation rule: first, a fear that allowing aggregation in diversity cases could clutter the federal courts with minor controversies involving matters of state law, and, second, keeping trivial lawsuits from increasing the workload of the federal courts. Taxpayer Suits and the Aggregation of Claims: The Vitiation of Flast by Snyder, 79 Yale L.J. 1577, 1587–88 (1970). It seems clear that neither of these justifications applies to the instant suit. The question involved is one of federal statutory interpretation involving the expenditure in the State of New York of millions of federal dollars. Moreover, an action which will determine the procedure that a state must observe before cutting back Medicaid expenditures can hardly be classified as trivial.

A recent decision by the Court of Appeals for the First Circuit, Berman v. Narragansett Racing Ass'n, 414 F.2d 311 (1st Cir. 1969) (hereinafter referred to as *"Berman"*) reviewed the question of aggregation of claims. I find the holding and rulings announced by that Court particularly applicable to the instant action. In *Berman*, a group of horse owners who had won purses at defendants' race tracks sued under an agreement whereby they were to receive 44.7 per cent of the track's annual share of the purses. For over thirty years, the track and the state had been splitting the "breakage", which consisted of the odd cents on a winning ticket. However, the track never included its share of the "breakage" in computing the amount to be paid to the group of horse owners. It is important to note that the Court found that under the agreement the track was merely to pay the 44.7 per cent to the horse owners as a group and that distribution to individual members was discretionary with the track; that is, the individual owners had no separate contractual right to a sum certain.

The Court in *Berman*, at 314, began its discussion by quoting from Pinel v. Pinel, 240 U.S. 594, 596, 36 S.Ct. 416, 60 L.Ed. 817 (1916), a leading case on aggregating the claims of a class or group:

> "The settled rule is that when two or more plaintiffs having separate and distinct demands unite in a single suit, it is essential that the demand of each be of the requisite jurisdictional amount; but when several plaintiffs unite to enforce a single title or right in which they have a common and undivided interest, it is ·enough if their interests collectively equal the jurisdictional amount."

The essential issues in *Berman*, as in the within suit, were determining the matter and value of the matter in controversy.

The Court found that the matter in controversy was 44.7 per cent of the track's share of the "breakage" for the thirty years, a sum well over a million dollars. In reaching that conclusion, the Court analogized the situation to one where a trustee is sued for a sum which, if recovered, would be paid into a trust estate for later proportional distribution. The pecuniary result of a judgment in *Berman* would have been a fund for the benefit of the group of horse owners. Similarly, in the present action, the state is in a position of a trustee holding state and federal monies for the benefit of the medically needy, and the direct result of the present injunction action, if plaintiffs are successful, would be to make the fund continuously available to the class, at least until approval by the Secretary is obtained. Hence, the matter in controversy is not the individual claims of the members of the class of medically needy, but it is the amount of money by which the State will cut back the Medicaid Program, a sum conceded to be in excess of $10,000.

The *Berman* Court applied the traditional aggregation tests to the situation before it. The rights of the group had to be common and undivided, and it was sufficient that the claims in their totality constituted an integrated claim against the defendant. As in *Berman*, the plaintiffs herein make no specific claims for individual payment, and it is seriously doubted if they could; the absence of contractual rights between the parties is a significant factual similarity between the present suit and the one in *Berman*. Furthermore, there can be no doubt that whatever the result in this suit, the interests of the entire class will rise or fall together. Plaintiffs contend that the State cannot make any changes in the Medicaid Program without prior federal approval; no class member claims that prior federal approval is required before the State can cut off his particular benefits. It is obvious that a ruling on the question presently before this Court will affect each and every member of the class. Defendants do not argue, nor

could they, that the State could be liable to some class members and not to others. Clearly, the claims of the class members are common and undivided and constitute an integrated claim against defendants.

An additional consideration in *Berman* was the defendants' interest in how the fund would be apportioned if the plaintiffs prevailed. The only issue was whether the tracks were liable for 44.7 per cent of the "breakage". The liability of the defendant was the same regardless of the ultimate distribution among the class members. So it is with the interest of the State of New York in how the Medicaid "fund" is distributed to the medically needy. The sole concern of New York for purposes of this action is whether it must make the fund available to the medically needy, and not how much of the fund each member of the plaintiff class will ultimately receive. "The interests of the plaintiffs, *vis a vis* the matter in controversy, are 'common and undivided' and the fact that their interests are separable among themselves is immaterial." *Berman, supra*, 414 F.2d at 316. A different conclusion might be compelled if each claim of the individual class members rested upon its own merits and a plaintiff received a specific amount due him rather than a benefit from a common fund. *Cf.* Shields v. Thomas, 58 U.S. (17 How.) 3, 5, 15 L.Ed. 93 (1854). The present action cannot be characterized as a collection of individual lawsuits since "[t]he preservation of the trust fund is the prime jurisdictional consideration." Redmond v. Commerce Trust Co., 144 F.2d 140, 151–152 (8th Cir.), cert. denied, 323 U.S. 776, 65 S.Ct. 187, 89 L.Ed. 620 (1944); *accord, Berman*, 414 F.2d at 317. The prime consideration of the class is the right of the medically needy to have an unreduced Medicaid "fund" available to them. If they prevail on their contention that the State cannot act without prior federal approval, then the entire class will benefit; if not, the entire class will suffer. Moreover, it is in the interest of the State that all persons claiming to be medically needy be parties to this action

so that they will all be bound if the State prevails on the merits. Manufacturers Casualty Ins. Co. v. Coker, 219 F.2d 631, 634 (4th Cir. 1955).

Another case that suggests that aggregation should be permitted herein is Dixon v. Northwestern Nat'l Bank, 276 F.Supp. 96 (D.Minn.1967), wherein the eight individuals sued the bank as trustee of an employees' profit sharing trust, claiming that the bank had improperly used the fund to buy and invest in worthless stock. Again the question was whether the plaintiffs had a common and joint right in the requested relief. The Court held that the beneficiaries of the fund were jointly interested in the right to proper trust administration, noting that "[t]his petition is based upon a common and undivided obligation and liability—the preservation and proper distribution of a trust fund wherein all beneficiaries are interested in preservation of the fund * * *." Redmond v. Commerce Trust Co., 144 F.2d at 151; accord, Dixon v. Northwestern Nat'l Bank, 276 F.Supp. at 101; Citizens Banking Co. v. Monticello State Bank, 143 F.2d 261, 264 (8th Cir. 1944). The Dixon Court, in determining that the claims of the eight plaintiffs could be added together to reach the necessary jurisdictional amount, concluded that the claimants sought recovery pursuant to a single instrument and that each was interested in the same breach of trust, and only one trust fund was involved. A parallel can be drawn between Dixon and the situation herein. The medically needy are jointly interested in the proper administration by the State of the Medicaid monies and the preservation of those monies. The class here claims pursuant to the Social Security Act, just as the beneficiaries claimed in Dixon, supra, pursuant to the trust agreement, that there is only one "fund" involved. The State is not attempting to cut back Medicaid payments to the medically needy on an individual basis; rather, it has done so on a class basis. It would indeed be incongruous to allow the State to now deal with plaintiffs on an individual basis.

Accordingly, I conclude that this Court does have jurisdiction of the instant action under 28 U.S.C. § 1331. The instant situation is legally indistinguishable from those cases heretofore discussed in which trust beneficiaries asserted a common and undivided interest in the proper administration and preservation of a single fund. In such cases, the matter in controversy is the fund since the plaintiffs have no individual claims but only those of the class. The matter in controversy herein is the amount by which the State intends to cut back its expenditures on Medicaid for the medically needy, and that amount is clearly in excess of $10,000. Hence, aggregation of the claims of the medically needy is proper, and jurisdiction is clearly established under 28 U.S.C. § 1331.[6]

6. Plaintiffs have also argued that the individual class members meet the jurisdictional requirement of $10,000 since the amount in controversy is the value of the right which they seek to protect and not the amount of money it would take to prevent the alleged irreparable injury. This Court agrees. The instant action is distinguishable from Rosado v. Wyman, 414 F.2d 170, 176–177 (2d Cir. 1969) rev'd, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), in which the court held that the indirect damage to welfare recipients whose benefits had been decreased was too speculative to be considered as a basis for jurisdiction under § 1331. However, the damage to the medically needy if they are deprived of Medicaid payments is neither indirect nor speculative. The plaintiffs have stated quite clearly what will happen to them if they are denied L-dopa. They will not be able to function as normal human beings, will be confined to their homes, and one will lose his part-time job. Admittedly, it is not easy to put a value on these consequences; yet, juries do so every day. Only if it can be shown to a legal certainty that these plaintiffs will not incur at least $10,000 damages should the court find it is without jurisdiction. McDonald v. Patton, 240 F.2d 424, 426 (4th Cir. 1957). Plaintiffs need not show to an absolute certainty that the amount in controversy exceeds $10,000; present probability is sufficient. St. Paul

Having determined that jurisdiction is properly vested in this Court, we consider whether an injunction should issue.

Useful to an understanding of the conclusions to be set forth herein would be a brief review of the legislative history of some relevant sections of the Act.

It cannot be doubted but that Congress was sensitive to and cognizant of the severe fiscal problems the medicaid program imposed upon the participating states. Indeed, the Senate Committee on Finance, upon the recommendation of Governors of various states, urged that Section 1903(e) of the Act, 42 U.S.C. § 1396b(e), which as originally enacted provided:

"The Secretary shall not make payments under the preceding provisions of this section to any State unless the State makes a satisfactory showing that it is making efforts in the direction of broadening the scope of the care and services made available under the plan and in the direction of liberalizing the eligibility requirements for medical assistance with a view toward furnishing by July 1, 1975, comprehensive care and services to substantially all individuals who meet the plan's eligibility standards with respect to income and resources, including services to enable such individuals to attain or retain independence or self-care." U.S.Code Cong. & Adm.News, 91st Cong. 1st Sess. at 1080,

be suspended in operation "until such time as the Congress determines otherwise." *Id.* at 1079.

Regressing for a moment to legislative commentary upon Section 1903(e), 42 U.S.C. § 1396b(e), it is to be noted that said provision was enacted "in order to encourage the continued development in the States of a broadened and more liberalized medical assistance program so that all persons who met the State's test of need * * * [would] receive the medical care which they need by 1975." Report of Ways and Means Committee on the Social Security Amendment of 1965, 89th Cong. 1st Sess., H.R. No. 213 et 74. The manifest intent of Section 1903(e) of the Act was to insure that by 1975 comprehensive medical care would be available to the participating states' medically needy.

Thus, when the Senate Finance Committee recommended indefinite suspension of this section of the Act, it was in direct reaction and response to the states' cries of impoverishment. U.S. Code Cong. & Adm.News, 91st Cong. 1st Sess. at 1081–82. Fortunately for the beneficiaries of Medicaid, the Finance Committee's recommendation to suspend Section 1903(e) was rejected in favor of a compromise whereby said section was suspended in operation for two years (until July 1, 1971) and the time within which the participating states would be required to achieve a comprehensive medical assistance program was extended for two years until July 1, 1977. 42 U.S.C. § 1396b(e). In conjunction with

Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 288–289, 58 S.Ct. 586, 82 L.Ed. 845 (1938); Food Fair Stores, Inc. v. Food Fair Inc., 177 F.2d 177, 184 (1st Cir. 1949); Friedman v. Int'l Ass'n of Machinists, 95 U.S.App.D.C. 128, 220 F.2d 808 (1955). Moreover, the amount in controversy is determined not merely by the pecuniary damage to the plaintiff, but also the value of the rights they seek to protect. Bitterman v. Louisville & Nashville R.R. Co., 207 U.S. 205, 225, 28 S.Ct. 91, 52 L.Ed. 171 (1907); Hunt v. New York Cotton Exchange, 205 U.S. 322, 336, 27 S.Ct. 529, 51 L.Ed. 821

(1907); Glenwood Light and Water Co. v. Mutual Light, Heat & Power Co., 239 U.S. 121, 126, 36 S.Ct. 30, 60 L.Ed. 174 (1915); Seaboard Finance Co. v. Martin, 244 F.2d 329, 331 (5th Cir. 1957); Pennsylvania Ry. Co. v. City of Girard, 210 F.2d 437, 439 (6th Cir. 1954). Certainly the right to exist in society as relatively healthy people is worth more than $10,000. *Cf.* Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed. 2d 491 (1970); Goldberg v. Kelly, 397 U.S. 254, 264, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Johnson v. Harder, 438 F.2d 7, 11–12 (2d Cir. 1971).

the two-year suspension and extension, Section 1902(d), 42 U.S.C. § 1396a(d) was enacted ostensibly for the purpose of insuring "that States * * * maintain the non-Federal expenditures level under their medicaid programs. * * [and] to avoid [permitting] a State [from] using * * * [the] amendments as an excuse to simply cut back on its program indiscriminately." 115 Cong.Rec. 17702 (1969) (remarks of Senator Long).

Senator Harris, after noting the national goal of increasing medical assistance to the poor, commented with regard to Section 1902(d) of the Act that:

"Federal funds are made available to States participating in medicaid with certain conditions attached thereto which will insure that medical assistance to the needy will at least remain at the same level when a State enters the program and will thereafter be continually improved until comprehensive services are offered. To abandon this objective and take regressive steps would be most unfortunate." 115 Cong.Rec. 17703 (1969).

Senator Ribicoff, who further commented upon the unanticipated soaring medical costs and concomitant fiscal crises faced by the states, similarly acknowledged that "our purpose must be to control these rising costs and to tighten up program administration without sacrificing national goals and without penalizing the recipients of medical assistance." 115 Cong.Rec. 17703 (1969).

Manifestly, the New York statutes and administrative letters at issue herein undercut the national goal of achieving comprehensive health care for the medically needy; more important, however, is the fact that their implementation without Secretarial approval would deprive the beneficiaries of the program of the very protection which Section 1902(d) was intended to afford. No state should be permitted to reap the benefits of federal funding and then "abandon the basic aims of Medicaid in

order to deal with a financial crisis. * * * " *Id.*

With this legislative background in mind we reconsider the relevant provisions of subdivision (d) of Section 1902 of the Act, 42 U.S.C. § 1396a(d). The first sentence of said subdivision in substance provides that if a state desires to modify its plan so as to terminate or reduce the scope or extent of medical assistance, the Secretary shall approve such modifications provided the Governor certifies that the state has fulfilled certain substantive preconditions, and the Secretary makes a specified finding.

■ While the legislative history heretofore discussed does not specifically refer to prior approval by the Secretary, the tenor of the comments made by the various Senators certainly suggests that the Act and its amendments were enacted to maintain and improve health care for the nation's medically indigent. Moreover, the language used in the first sentence of 1902(d) is mandatory in its terms—it provides that the Secretary shall approve the modifications upon certain conditions. I can only conclude, therefore, that prior approval by the Secretary is a *sine qua non* to the implementation of the modifications at issue herein. Section 1902(d), 42 U.S.C. § 1396a(d), by its language and history affords medicaid recipients protection from state modifications which would reduce benefits and services, at least until federally approved.

■ Defendants further contend that the injunctive relief sought herein is inappropriate under Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), and King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). In *Rosado, supra,* 397 U.S. at 420, 90 S.Ct. at 1222, the Court specifically noted:

"We have considered and rejected the argument that a federal court is without power to *review state welfare provisions or* prohibit the use of federal funds by the States in view of the fact that Congress has lodged in

the Department of HEW the power to cut off federal funds for non-compliance with statutory requirements. We are most reluctant to assume Congress has closed the avenue of effective judicial review to those individuals most directly affected by the administration of its program. [Citations omitted.] We adhere to King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968), which implicitly rejected the argument that the statutory provisions for HEW review of plans should be read to 'curtail judicial relief * * *." (Emphasis added.)

The Court further noted with apparent approval that "[t]he prayer in the District Court in Smith v. King, as in the case before * * * [it] was for * * injunctive relief against the enforcement of the invalid provision." Rosado v. Wyman, *supra,* 397 U.S. at 421, 90 S.Ct. at 1222.

Moreover, although the *Rosado* Court, *supra* at 422, 90 S.Ct. at 1223, admonished federal courts to refrain from involving themselves in the complicated area of welfare benefits at least until HEW acted, it went on to remind the federal judiciary "of * * * [its] traditional jurisdiction to hear and decide federal questions * * *."

Finally, it must be remembered that in *Rosado,* the case was remanded to the district court with instructions to enjoin further use of federal funds pending New York's submission, within a reasonable time, of a conforming plan. By so doing, the Court prevented continuation of an existing unlawful plan and afforded New York an opportunity to present the district court with a non-offending plan. In the instant case, since the Act contains a condition precedent to the implementation of reductive modifications by the states, it would appear appropriate to enjoin the reductions, pending federal approval, in order to prevent implementation of an unlawful modification; that is, by presently enjoining the State from giving effect to the disputed statutes and administrative letters, the lawfulness of the program will be maintained. Were the posture of this case such that the modifications were already approved and being challenged as unlawful, then under *Rosado, supra,* the state would be entitled to an opportunity to submit alternative modifications in order to avoid an injunction against federal funding. Viewed in its present posture, however, the only remedy consistent with the conclusions announced herein, and that will protect plaintiffs and the members of the class, would be to enjoin the reductions until approved by the Secretary.

Equally unavailing is the contention that the only proper remedy herein would be enjoining the State from using federal funds. Since it is well established that "the Federal Government, unless barred by some controlling constitutional prohibition, may impose the terms and conditions upon which its money allotments to the States shall be disbursed, and that any state law or regulation inconsistent with such federal terms and conditions is to that extent invalid.", King v. Smith, *supra,* 392 U.S. at 333 n. 34, 88 S.Ct. at 2141, there can be little doubt that a finding of state non-compliance with a Congressionally imposed condition precedent to the modification of a federally funded program is a proper basis for the issuance of the injunction sought herein.

The Court has considered and rejected defendants' contention that granting an injunction will deprive the State of its right to implement its modifications and continue receiving federal funds unless and until the Secretary determines that it is not in conformity with the Act's requirements. 42 U.S.C. § 1396c. More specifically, defendants unpersuasively urge that they are entitled to modify the State plan so as to reduce the benefits thereunder and that said modification may initially be stricken only by the Secretary pursuant to Section 1904 of the Act, 42 U.S.C. § 1396c, which section is set out in full *infra.* Congress and

not this Court has imposed upon the states the burden of first seeking Secretarial approval of modifications which reduce the scope and extent of medical assistance. 42 U.S.C. § 1396a(d). Since the Act protects medicaid beneficiaries from a reduction of benefits unless the state complies with the substantive requirements of Section 1902 (d), 42 U.S.C. § 1396a(d), it follows that in order to insure fulfillment of these substantive preconditions Congress has required that the states comply with a procedural condition precedent to implementation of reductions.

We do not consider, nor should we at this stage of the suit, whether the reductions are in fact valid; rather, we merely construe Section 1902(d) of the Act, 42 U.S.C. § 1396a(d) as first requiring approval by HEW based upon a requisite certification by the Governor and a specified finding by the Secretary. If the Secretary accepts the certification, makes the requisite finding, and approves the modification pursuant to the statute, the cutbacks may lawfully go into effect. Should the Secretary not so approve, then it would appear that a conformity hearing in accordance with Section 1904 of the Act, 42 U.S.C. § 1396c, must be conducted in order to determine whether federal funding will be terminated.

Section 1904 of the Act, 42 U.S.C. § 1396c, provides as follows:

"If the Secretary, after reasonable notice and opportunity for hearing to the State agency administering or supervising the administration of the State plan approved under this subchapter, finds—

(1) that the plan has been so changed that it no longer complies with the provisions of section 1396a of this title; or

(2) that in the administration of the plan there is a failure to comply substantially with any such provision;

the Secretary shall notify such State agency that further payments will not be made to the State (or, in his discretion, that payments will be limited to categories under or parts of the State plan not affected by such failure), until the Secretary is satisfied that there will no longer be any such failure to comply. Until he is so satisfied he shall make no further payments to such State (or shall limit payments to categories under or parts of the State plan not affected by such failure)."

To read harmony into Sections 1902 (d) and 1904 of the Act, it would appear that: (a) until Secretarially approved the cutbacks cannot be effected by the states; (b) once approved by the Secretary they may be lawfully implemented (of course approval by HEW is subject to judicial review); and (c) should the modifications not be federally approved then they may not take effect and the Secretary must provide the State with an opportunity for a hearing before he withholds federal monies.

In effect, then, Section 1396a(d) of Title 42 is a stop-gap, providing protection for medicaid recipients from reductive modifications by the states, at least until approved by the Secretary, and if not so approved, pending formal disapproval pursuant to 42 U.S.C. § 1396c. Without this protection, modifications reducing the scope of medical coverage could become effective upon enactment and remain in effect until disapproved at a conformity hearing. Such protection appears consistent with the legislative history heretofore discussed, since it affords the medically indigent an assurance against a reduction of benefits at least until a prima facie showing and finding of the validity of the modification is made. If the statute were construed so as to permit reductive modifications prior to federal approval, months or years could elapse before a patently unlawful modification is formally disapproved by the Secretary. This would be inconsistent with both the terms and history of Section 1902(d) of the Act, 42 U.S.C. § 1396a(d). Further, with regard to conformity hearings, it must

be remembered that the remedy provided therein is to terminate federal funding. This, of course, affords no protection to recipients of the program while the federal grants continue.

Even assuming that under National Welfare Rights Org. v. Finch, 429 F.2d 725 (D.C.Cir. 1970), plaintiffs have standing to participate in a conformity hearing and thereby perfect their standing to seek judicial review should they become aggrieved therein, National Welfare Rights Org. v. Finch, *supra* at 737; Association of Data Process Serv. Org., Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), this should not prevent them from initially asserting the more protective statutory right they seek to enforce herein. The right to intervene in a conformity hearing is one step removed from the issue presented herein; to wit, may plaintiffs enjoin implementation of reductive modifications pending Secretarial approval? A conformity hearing would only properly be conducted after the Secretary takes some action with respect to the state's proposed modifications.

We must further consider the *Rosado* Court's specific observation, *supra*, 397 U.S. at 406, 90 S.Ct. at 1215, that "HEW has no procedures whereby * * * [the Act's beneficiaries] may trigger and participate in the Department's review of state * * * programs", *accord* National Welfare Rights Org. v. Finch, 429 F.2d at 738, and suggestion that welfare cases "be formally placed under the supervision of HEW, at least in the first instance. * * *" Rosado v. Wyman, 397 U.S. at 422, 90 S.Ct. at 1223.

By permitting intervention in the conformity hearing in National Welfare Rights Org. v. Finch, *supra,* Judge Wright took the first step in implementing the Supreme Court's suggestion. While the next step would doubtless be not merely to follow Judge Wright and permit intervention, but rather to permit the Act's beneficiaries to trigger a review by HEW of a state's program or modifications thereof, we do not reach that issue herein. While this may be a practical solution should the Secretary ultimately approve a modification challenged by recipients as unlawful, unless and until such approval is forthcoming this issue is not now properly before this Court. Thus, until approved by the Secretary, any challenge to the substance of New York's modifications is premature simply because HEW will not have acted "at least in the first instance". Rosado v. Wyman, 397 U.S. at 422, 90 S.Ct. at 1223.

Accordingly, and for the foregoing reasons, plaintiffs' motion for a preliminary injunction is granted.

Settle order on notice in accordance herewith.